Filed 10/18/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S191934 |
| v. | ) | |
| | ) | Ct.App. 1/2 A125969 |
| AHKIN RAMOND MILLS, | ) | |
| | ) | Alameda County |
| Defendant and Appellant. | ) | Super. Ct. No. C154217 |
| _____ | ) | |

"When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed." (Pen. Code, § 1026, subd. (a).)[1] In this case defendant was charged with murder, pled not guilty, and also raised an insanity defense. At the guilt phase trial, the prosecutor requested a jury instruction that defendant was conclusively presumed to have been sane at the time of the offense. Defendant objected that the instruction might lead the jury to disregard the evidence of his mental illness and its effect on the intent required for murder. The court overruled the objection, gave the instruction on the presumption of sanity, and refused defendant's request for an instruction on the legal definition of sanity.

---

[1] Further unspecified statutory references are to the Penal Code.

1

The jury convicted defendant of first degree murder. In the subsequent sanity trial it found that he was sane at the time of the offense. The court sentenced him to a term of 50 years to life in prison. On appeal below, defendant contended the guilt phase instruction on the conclusive presumption of sanity was improper because (1) it told the jury to presume the existence of a mental state critical to the state's burden of proof, violating due process, and (2) it had no application to any issue before the jury, violating state law. The Court of Appeal affirmed the judgment.

We conclude that although defendant establishes no due process violation, the instruction was erroneous under state law. The question of a defendant's sanity is entirely irrelevant at the guilt phase of a bifurcated trial under section 1026. Therefore, no instruction on the subject should be given. However, the error was harmless in this case.

## I. BACKGROUND

Shortly before 5:00 on the afternoon of April 21, 2005, Jason Jackson-Andrade entered the Amtrak station in Emeryville. Eyewitness testimony established the ensuing events. As Jackson-Andrade sat on a bench on the platform, defendant approached him and launched a tirade of insults. He told Jackson-Andrade, "You ain't getting on that train." Jackson-Andrade went into the station, sat down, and asked a woman if she knew the man outside. She said she did not. Jackson-Andrade told her he had not done anything, but the man was "cussing" at him and acting as though he wanted to kill him.

Defendant walked around on the platform for several minutes, bouncing on his toes, humming, and talking to himself. He then began walking toward the station in a determined manner, saying, "You got a gun, nigger? You got a gun? You got a gun?" He entered the station, approached Jackson-Andrade, and twice said, "Motherfucker, you want to kill me?" He also asked, "You got a gun?" As

2

Jackson-Andrade looked up at him, defendant said, "Well, if you ain't got no motherfucking gun, I do," and produced a revolver from his pocket. Defendant shot Jackson-Andrade, who held up his hands and said, "Please, don't shoot me again, don't shoot." Jackson-Andrade fell from his seat and began crawling away. Defendant shot him five more times in the back and once in the back of the thigh.

When the police arrived, defendant lay on the ground, sliding his gun forward and assuming a prone position. He told them he was the only shooter. Jackson-Andrade died at the scene.

Defendant testified in his own defense. He claimed that because of death threats from various individuals, he and his wife had left their home in Merced to live with his cousin Telitha in Rodeo. He had been visiting another cousin in Sacramento in the days before the murder. As he walked around Sacramento, he began to suspect that he was being followed. On the morning of the murder, he stole a car at gunpoint and drove from Sacramento to Rodeo. He had Telitha take him to the Amtrak station because he did not want the people following him to find her or his wife. As he approached the station, he heard someone say, "You're going to feel it today," which he took to mean that he was going to be shot.

On the platform, defendant became suspicious of two men, one of whom looked at him and said into his cell phone, "He looks scared." Defendant claimed that after these men left, Jackson-Andrade beckoned to him. As defendant approached, Jackson-Andrade became angry and threatened to kill him. Jackson-Andrade then got up and went into the station, pausing at the door to make a hand gesture indicating that he had a gun. Defendant was nervous, and had to go to the bathroom, so he entered the station. When he saw Jackson-Andrade sitting inside talking to a lady, defendant "jumped" and the contents of his backpack spilled onto the floor. Jackson-Andrade got up and put his hand into his pocket. Defendant thought he was reaching for a gun, so he shot him. As Jackson-

3

Andrade lay on the ground, defendant again thought he was reaching for a weapon, so defendant shot him again. Defendant testified that he shot only twice, but on cross-examination admitted he had reloaded his gun and continued firing.

Defendant's wife and cousin testified that he told them people were after him. His wife said he thought radio commercials were speaking to him, that the FBI was in a FedEx truck, and that cars were following him. A psychologist testified for the defense. After interviewing defendant, reviewing the police reports and witness statements, and giving defendant several psychological tests, he concluded that in April 2005 defendant suffered from a delusional disorder in the paranoid spectrum. The expert carefully focused his testimony. In his opinion, defendant did not suffer from a severe mental illness like schizophrenia or bipolar disease, nor were his delusions utterly beyond the realm of possibility. They concerned events that might actually happen, but defendant's belief in them was a function of his paranoid personality style. He tended to be hypervigilant, interpreting events in a personalized and threatening way. Stress exacerbated his symptoms.

The theory of the defense was good faith but unreasonable self-defense, also known as "imperfect" self-defense. (See *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88; *In re Christian S.* (1994) 7 Cal.4th 768, 773.) Defense counsel urged the jury to find defendant guilty only of manslaughter, because he actually but unreasonably believed the victim posed an imminent threat when he shot him. However, counsel also argued that defendant's fear was not purely delusional. Noting the jury would be instructed that the fear giving rise to unreasonable self-defense may not derive from delusion alone, counsel contended defendant's fears were based on actual facts and experiences that he misinterpreted due to his paranoia.

4

The prosecutor requested a special instruction based on section 1026: "For purposes of reaching your verdict during this guilt phase of the proceedings, the defendant is conclusively presumed to have been sane at the time of the offense." Defendant filed a written objection, arguing that "giving this instruction would violate Defendant's rights to due process and a fair trial because it might tend to confuse the jury and would have the effect of lower[ing] the prosecution's burden of proving intent. . . . Specifically, the Defense submits this instruction might be mis-interpreted by the jury as directing them to disregard Defendant's evidence regarding mental illness, and that the jury may mis-interpret this instruction as directing them to presume a mental condition which has not been adequately defined or distinguished from Defendant's evidence regarding mental illness." If the instruction were to be given, defendant asked the court to instruct the jury on the legal definition of insanity, and advise it that "The presumption of sanity does not mean you are to disregard evidence of mental illness. You may consider such evidence as directed by other instructions I have given you."

The court gave the special instruction on the presumption of sanity, immediately following an instruction on unreasonable self-defense. It refused to give defendant's proposed additional language, stating: "I don't want to get into what the definition of sanity is in this phase of the proceedings and I don't think that you can be wrong by correctly stating the law."

Defendant raised a number of claims in the Court of Appeal under both state and federal law, including challenges to these instructional rulings. The court rejected his federal due process claim, and did not address his state law arguments. The court noted that the Ninth Circuit Court of Appeals has found due process violations in similar cases, and acknowledged that the reasoning of these opinions was "not obviously flawed." (See *Stark v. Hickman* (9th Cir. 2006) 455 F.3d 1070, 1076 (*Stark*); *Patterson v. Gomez* (9th Cir. 2000) 223 F.3d 959, 966-967

5

(*Patterson*).)  Nevertheless, the court concluded that the Ninth Circuit's rationale had been "fatally undermine[d]" by *Clark v. Arizona* (2006) 548 U.S. 735 (*Clark*). We granted defendant's petition for review, limiting the scope of our review to the propriety of the court's instruction on the conclusive presumption of sanity.

## II.  DISCUSSION

### A. *Evidentiary Consequences of the Presumption of Sanity*

Section 1026 has provided for a bifurcated trial on the issue of insanity, and a conclusive presumption of sanity at the initial guilt phase, since 1927.  (Stats. 1927, ch. 677, § 4, p. 1149.)[2]  In *People v. Troche* (1928) 206 Cal. 35 (*Troche*), this court established a rule that "all evidence tending to show the mental condition of the defendant at the time of the commission of the offense" was inadmissible at the guilt phase.  (*Id.* at p. 46; accord, e.g., *People v. Coleman* (1942) 20 Cal.2d 399, 406; *People v. French* (1939) 12 Cal.2d 720, 737.)

The strict rule of inadmissibility was moderated in *People v. Wells* (1949) 33 Cal.2d 330 (*Wells*).  Wells was a prison inmate accused of assault with malice aforethought under section 4500.[3]  He argued that evidence of his mental state, relevant to the issue of malice, was improperly excluded from his trial.  (*Wells*, at pp. 343-345.)  Because Wells did not plead insanity, the applicable presumption of sanity was that provided in section 1016, which governs in the ordinary case.  (See

---

[2]    Section 1016, as amended by the same 1927 legislation, provides similarly: "A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged . . . ."

[3]    "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole."  (§ 4500.)

6

fn. 2, *ante*.)  Nevertheless, the *Wells* court found it useful to address how the presumption operates in bifurcated proceedings under section 1026, and necessary to disapprove some language in earlier opinions applying section 1026.

The court reasoned that while sanity is conclusively presumed at the guilt phase of a bifurcated trial, the mens rea element of a crime is *not* presumed, conclusively or otherwise.  "Whenever a particular mental state, such as a specific intent, is by statute made an essential element of a crime, that specific state must be proved like any other fact.  [Citations.]"  (*Wells*, *supra*, 33 Cal.2d at p. 350.)  Therefore, competent evidence that the defendant did or did not possess the required mental state is admissible, whereas evidence tending to show legal sanity or insanity is not.  (*Id*. at p. 351.)  "[I]f the proffered evidence tends to show not merely that he *did* or *did not*, but rather that because of legal insanity he *could* not, entertain the . . . essential mental state, then that evidence is inadmissible under the not guilty plea and is admissible only on the trial on the plea of not guilty by reason of insanity. . . .  Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated . . . ."  (*Ibid*.)

The *Wells* court noted that *Troche* itself had considered the bifurcation required by section 1026 " '*but a departure in procedure*,' " which did not alter the presumption of innocence or the defendant's right to introduce competent evidence on any element of guilt.  (*Wells*, *supra*, 33 Cal.2d at p. 355, quoting *Troche*, *supra*, 206 Cal. at p. 44.)  *Wells* disapproved *Troche*, *French*, and *Coleman* to the extent they barred "the admissi[on] of evidence otherwise competent and material, to prove or to disprove the possession by a defendant of a specific mental state (other than sanity or insanity), which must be proved as an essential factual element of the particular crime charged."  (*Wells*, at p. 355.)

7

*Wells* emphasized that mental state evidence at the guilt phase must tend to show that the defendant did or did not, in fact, possess the requisite criminal intent. Evidence that the defendant *could not* have formed such an intent due to legal insanity was reserved for the sanity phase. (*Wells*, *supra*, 33 Cal.2d at pp. 350-351.) However, that view was eroded in a series of subsequent opinions establishing the doctrine of diminished capacity. (See *People v. Wetmore* (1978) 22 Cal.3d 318, 323-326, discussing cases.) The evolution of that doctrine, and the responses by way of legislation and a 1982 initiative measure abolishing the defense of diminished capacity, are reviewed in *People v. Saille* (1991) 54 Cal.3d 1103, 1109-1112 (*Saille*).

The statutory reforms described in *Saille* preserved as a defense the actual failure to form a specific intent, sometimes referred to as "diminished actuality." (§ 28, subd. (a); see *People v. Williams* (1997) 16 Cal.4th 635, 677.) They discarded the judicially adopted American Law Institute standard for determining mental incapacity, and restored the *M'Naghten* test for insanity that California courts had followed from 1864 to 1978. (See *People v. Skinner* (1985) 39 Cal.3d 765, 768-769; *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].) Under the *M'Naghten* test, insanity is established if the defendant was incapable of knowing or understanding the nature and quality of the criminal act, or of distinguishing right from wrong. (§ 25, subd. (b); *Skinner*, at pp. 775-777.)

As a result of these developments, the current state of California law on the insanity defense and proof of the defendant's mental state is generally consistent with the principles set out in *Wells*. At a trial on the issue of guilt, "[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a); see *Saille*, *supra*, 54 Cal.3d at pp. 1115-1117.)

8

Thus, while the evidence of a defendant's mental state at the guilt and sanity phases "may be overlapping" (*People v. Hernandez* (2000) 22 Cal.4th 512, 520), the defendant's sanity is *irrelevant* at the guilt phase and evidence tending to prove insanity, as opposed to the absence of a particular mental element of the offense, is *inadmissible* (§ 28, subd. (a); *People v. Haskett* (1990) 52 Cal.3d 210, 232; *Wells*, *supra*, 33 Cal.2d at p. 351).

Notably, a defendant may suffer from a diagnosable mental illness without being legally insane under the *M'Naghten* standard. (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 17 et seq., p. 349 et seq.) A defendant who elects to plead both not guilty and not guilty by reason of insanity may have the opportunity to employ mental state evidence in two different ways. At the guilt phase, the People must prove all elements of the charged offense, including mens rea. The defense may not claim insanity. It may, however, produce lay or expert testimony to rebut the prosecution's showing of the required mental state.[4] If found guilty, at the next phase of trial the defendant bears the burden of proving, by a preponderance of the evidence, that he was legally insane when he committed the crime. (Evid. Code, §§ 115, 522; *People v. Kelly* (1973) 10 Cal.3d 565, 577, fn. 16.)

B. *Case Law on Presumption of Sanity Instructions*

The propriety of instructing the jury on the presumption of sanity was touched upon briefly and intermittently in the case law during the 25 years following the *Wells* decision. (See *People v. Baker* (1954) 42 Cal.2d 550, 567-569 [improper and prejudicial, in conjunction with other confusing instructions];

---

[4] An expert may not, however, offer an opinion on whether the defendant had the required mental state. That question is reserved by statute for the trier of fact. (§ 29.)

9

*People v. Webb* (1956) 142 Cal.App.2d 402, 413 [proper]; *People v. Rodriguez* (1969) 272 Cal.App.2d 80, 87 [proper]; *People v. Williams* (1971) 22 Cal.App.3d 34, 53-54 [improper and prejudicial]; *People v. Yanikian* (1974) 39 Cal.App.3d 366, 376 [improper but harmless].)

 *People v. Burton* (1971) 6 Cal.3d 375 (*Burton*) arose when the defense of diminished capacity was still recognized.   The court addressed a CALJIC instruction on intent that included a paragraph stating:  " 'For the purposes of the issues now at trial you must presume that the defendant was sane at the time of his alleged conduct which, it is charged, constituted the crime described in the information.' "[5]  (*Burton*, at p. 390, fn. 7.)  The defendant contended the instruction "conflicted with and vitiated the instruction given on diminished capacity."  (*Id*. at p. 390.)  Reversing the judgment on other grounds, the court stated, "We need not now decide whether such a conflict would be fatal . . . ."  (*Ibid*.)  It directed the trial court's attention on remand to the newly revised edition of CALJIC, which suggested that the paragraph at issue be omitted when there was evidence of diminished capacity.  (*Burton*, at pp. 390-391.)  Today, neither CALCRIM nor CALJIC includes any instruction on the presumption of sanity.

 After a period of quiescence, the issue next appeared in *People v. Coddington* (2000) 23 Cal.4th 529 (*Coddington*), a death penalty prosecution in which the defendant raised an insanity defense.  He argued that instructing

---

[5] The previous paragraph of the instruction, former CALJIC No. 73, provided:  " 'The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act.  All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity.' "  (*Burton*, *supra*, 6 Cal.3d at p. 390, fn. 7; see *People v. Henderson* (1963) 60 Cal.2d 482, 491-493 [prejudicial error to give this paragraph while omitting instruction on diminished capacity].)

prospective jurors that he would conclusively be presumed sane during the guilt phase undermined his claim that he had acted without premeditation. (*Id*. at p. 584.) We noted that the instruction correctly stated the law under section 1026, and that it was incumbent on the defendant to request clarification of the premeditation instructions if he believed the presumption of sanity would mislead the jury. In any event, we found no prejudice, observing that the instruction given to the prospective jurors was quite different from the *Burton* instruction. Further, the arguments of counsel and the guilt phase instructions made it clear that mental illness or defect could be considered in the jury's deliberations on premeditation. (*Coddington*, at pp. 584-585.)

The month after *Coddington* was decided, the Ninth Circuit Court of Appeals held that an instruction on the presumption of sanity violated the due process clause of the Fourteenth Amendment. *Patterson*, *supra*, 223 F.3d 959, involved a murder trial bifurcated under section 1026. At the guilt phase, the defendant contended he lacked the requisite mental state for first degree murder. (*Patterson*, at p. 964.) The trial court instructed the jury on mental disorder as it affected the formation of the mental state element of homicide. Immediately thereafter, it told the jury to " 'presume that the defendant was sane' " at the time of the alleged offense. (*Ibid*., italics omitted.)

The *Patterson* court declared: "If the jury is required to presume the non-existence of the very mental disease, defect, or disorder that prevented the defendant from forming the required mental state for first degree murder, that presumption impermissibly shifts the burden of proof for a crucial element of the case from the state to the defendant. Whether the jury was required to presume the non-existence of a mental disease, defect, or disorder depends on the definition of sanity that a reasonable juror could have had in mind." (*Patterson*, *supra*, 223 F.3d at p. 965.) We point out that telling the jury a defendant is presumed "sane"

11

is not the same as telling them to presume "the non-existence of a mental disease, defect, or disorder." (*Ibid*.) As we have noted, a person may suffer from a mental disease and not be "insane" under the *M'Naghten* standard.

In *Patterson*, however, the trial court did not explain that the presumption of sanity was "the analytical basis for the bifurcated trial," or provide the *M'Naghten* definition of insanity, or "warn the jury that 'sane' was being used in something other than the conventional lay sense." (*Patterson*, *supra*, 223 F.3d at p. 966.) Therefore, the court of appeals deemed the instruction on the presumption unconstitutional, and concluded the error was prejudicial. (*Id*. at pp. 966-968.)

*Patterson*'s holding was confirmed in *Stark*, *supra*, 455 F.3d 1070, another murder prosecution in which the defendant pleaded insanity and contended at the guilt phase that he acted without the mental state required for first degree murder. The trial court instructed the jury that in the guilt phase the defendant was conclusively presumed sane.[6] It did not define "insanity" for the jury. The California Court of Appeal, relying on *Coddington*, had held that the defendant was not prejudiced by the jury instruction. (*Stark*, at p. 1075.) The Ninth Circuit disagreed, reasoning that *Coddington* had not considered the due process

---

**6** The instruction in *Stark* was as follows: " 'In the guilt phase of a criminal action the defendant is conclusively presumed to be sane; however, you have received evidence regarding a mental defect or mental disorder of the defendant at the time of the commission of the crime charged, namely, murder of the first degree, murder of the second degree, or the lesser crime thereto, namely, voluntary manslaughter. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated, or harbored malice aforethought which are an element of the crime charged, namely murder of the first degree, murder of the second degree, or the lesser crime of voluntary manslaughter.' " (*Stark*, *supra*, 455 F.3d at p. 1075, italics omitted.)

implications of the presumption of sanity instruction (*Stark*, at p. 1076), and that the instructions before it were materially equivalent to those in *Patterson*; indeed, they were more egregious because the defendant was *conclusively* presumed to be sane (*Stark*, at p. 1078). It concluded that the instructions had relieved the state from the burden of proving the defendant's mental state, and reversed the conviction. (*Id*. at p. 1080.)

We recently considered the question in *People v. Blacksher* (2011) 52 Cal.4th 769 (*Blacksher*). In that capital case, the defendant argued that "the court's instruction on the presumption of sanity and the failure to give a requested pinpoint instruction hampered his mental illness defense and lowered the prosecution's burden of proof in violation of his due process rights." (*Id*. at p. 831.) We summarily rejected this claim: "The court properly instructed the jury that: 'In the guilt trial or phase of this case, the defendant is conclusively presumed to have been sane at the time[] the offenses . . . are alleged to have been committed.' Defense counsel did not object to this instruction and requested no further definition of sanity. Defendant now argues that this instruction effectively negated the defense that because of his mental illness he could not form the mental state required for murder. Yet the jury was given CALJIC No. 3.32, which is the standard instruction for this very defense.[7] As defendant acknowledges, we

[7]     "The court instructed the jury with CALJIC No. 3.32 as follows: 'You have received evidence regarding a mental disease, mental defect or mental disorder of the defendant at the time of the commission of the crime[s] charged in counts one and two or the lesser crimes thereto, namely, second degree murder and voluntary manslaughter. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated and deliberated or harbored malice aforethought, which are elements of the crime charged in counts one and two, namely, first-degree murder; whether he formed the required specific intent or harbored malice aforethought, which are elements of the lesser crime of second-degree murder; or whether he formed the

*(footnote continued on next page)*

13

rejected an identical argument in *People v. Coddington* [*supra*,] 23 Cal.4th 529, 584–585 . . . , and we are neither persuaded nor bound by any contrary decisions of the lower federal courts.  (*People v. Avena* (1996) 13 Cal.4th 394, 431.)" (*Blacksher*, at p. 831.)

   C.  *The Propriety of the Instruction*

      1.  *Due Process*

Defendant points out that here, unlike in *Coddington* and *Blacksher*, defense counsel objected to the instruction on the presumption of sanity and proposed a clarification.  He urges us to follow the reasoning of *Patterson* and hold that the instruction violated his federal constitutional right to due process. The Attorney General responds that the Court of Appeal correctly relied on *Clark*, *supra*, 548 U.S. 735, to reject the reasoning of the Ninth Circuit in *Patterson* and *Stark*.

   *Clark* sheds no light on the question before us.  The *Clark* court addressed no claim of instructional error, and considered the presumption of sanity only in connection with the admissibility of defense evidence of mental illness and incapacity.  (*Clark*, *supra*, 548 U.S. at pp. 742, 766-769.)  *Clark*, in a rather complicated formulation, posited three categories of mental state evidence: " 'observation evidence,' " " 'mental-disease evidence,' " and " 'capacity evidence.' "  (*Id*. at pp. 757-758.)  Only observation evidence was admissible under Arizona law to rebut the prosecution's evidence of mens rea.  (*Id*. at p. 760.) California law, by contrast, allows evidence of mental disease to be presented at

---

*(footnote continued from previous page)*

required specific intent, which is an element of the lesser crime of voluntary manslaughter.' "

the guilt phase, as demonstrated by the defense presented in this case. (§ 28, subd. (a); *People v. Hernandez*, *supra*, 22 Cal.4th at p. 520.)

The Court of Appeal below, however, was convinced that *Clark*'s rationale for upholding Arizona's more restrictive rule supported the jury instruction on the conclusive presumption of sanity. The court reasoned: "Because the issue of sanity is not germane to [the guilt] determination, it does no harm to instruct the jury of the state's policy that, for purposes of proceedings devoted to that determination, the presumption is one of sanity. . . . [I]t makes eminent sense for the jury to be told that sanity is not to be considered in the determination of guilt. The challenged instruction does just that, and no more than that. It thus reflects the state's 'authority . . . to deny a defendant the opportunity to displace the presumption of sanity . . . when addressing a different issue in the course of a criminal trial.' (*Clark*, *supra*, 548 U.S. 735, 771.)"

The Court of Appeal misread both the presumption of sanity instruction and the import of *Clark*'s reasoning. The jury in this case was not told to disregard the issue of sanity; rather, it was instructed, "*For the purpose of reaching a verdict in the guilt phase* of this trial, you are to conclusively presume that the defendant was legally sane . . . ." (Italics added.) The instruction is susceptible to the interpretation that the presumption of sanity is relevant to the jury's guilt phase deliberations. That reading is inconsistent with the bifurcated scheme established by section 1026, which requires the prosecution to prove guilt before the defendant assumes the burden of proving insanity.

The passage in *Clark* quoted by the Court of Appeal does not support an instruction on the presumption of sanity at the guilt phase. The *Clark* court was merely observing that it was within Arizona's power "to deny a defendant the opportunity to displace the presumption of sanity more easily when addressing" the question of guilt, at which point the burden of proof is on the prosecution, as

15

opposed to the question of sanity, on which the defense bears the burden. (*Clark*, *supra*, 548 U.S. 735, 771.) The court was justifying a restriction on the admission of mental state evidence, not an instruction on the presumption of sanity. California law, while granting the defense more latitude in the presentation of evidence at the guilt phase, denies a defendant the opportunity to displace the presumption of sanity by taking the issue of legal sanity off the table entirely until the sanity phase.

Thus, the instruction on the presumption of sanity had no bearing on any issue before the jury at the guilt phase of defendant's trial. Nevertheless, defendant fails to establish that he was deprived of due process. Because of the facts and the way this case was tried, the jury was unlikely to have applied the presumption of sanity in a way that unconstitutionally affected the burden of proof.

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. See *Sandstrom v. Montana*, 442 U.S. 510, 520-521 (1979). Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). ' "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp*, *supra*, at 146-147). If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' *Estelle*, *supra*, at 72 (quoting *Boyde*, *supra*, at 380)." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 (*Middleton*).)

16

Here, the jury was instructed on mental illness and its effect on defendant's actual formation of the intent required for murder. The instruction on the conclusive presumption of sanity could be understood to conflict with that instruction. However, unlike the defendants in *Patterson* and *Stark*, defendant did not claim that his mental illness resulted in "diminished actuality," i.e., a general absence of the requisite mental state. His claim was narrower and less directly related to considerations of sanity, in the lay sense, than were the defenses in *Patterson* and *Stark*.[8] He admitted that he intentionally shot the victim, and did not dispute the intent to kill. His argument was that he unreasonably believed in the need to defend himself, and therefore acted without malice and was guilty only of manslaughter. (See *People v. Rios* (2000) 23 Cal.4th 450, 461; *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1450-1452 [distinguishing "diminished actuality" from unreasonable self-defense, and holding that defendant who intended to kill could assert only the latter].)

Presumed sanity is consistent with unreasonable self-defense. "[A] person may be entirely free of any mental disease . . . but actually, although unreasonably, believe in the need for self-defense." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 778.) Indeed, defendant could not claim unreasonable self-defense based entirely on delusion.[9] His expert was careful to explain that defendant's paranoia was not

---

[8]     We express no view on whether *Patterson* and *Stark* were correctly decided. We note only that the defenses in those cases were not the same as defendant's here.

[9]     The jury was so instructed. (See fn. 10, *post*.) A rationale for this rule is articulated in *People v. Mejia-Lenares*, *supra*, 135 Cal.App.4th at pages 1456-1461. The validity of the rule is a question currently before this court in *People v. Elmore*, review granted February 2, 2011, S188238.

17

entirely delusional.  In this respect, the presumption of sanity did no harm to the theory of the defense.

On the other hand, defendant argued that his mental illness *contributed* to his unreasonable belief in the need to defend himself.  The prosecution bore the burden of establishing the element of malice.  To determine whether the instruction on the conclusive presumption of sanity was reasonably likely to have reduced the prosecution's burden of proof, we view the instructions as a whole and consider the effect of the challenged instruction in the context of the entire trial.  (*Middleton*, *supra*, 541 U.S. at p. 437.)

As noted, the jury was instructed on the relationship between the evidence of defendant's mental illness and the intent elements of murder.  The court told the jurors that they, not defendant's expert psychologist, must decide whether defendant acted with the required mental state.  The jury was also informed that hallucination could be considered as a contributing cause of the homicide, but that defendant's belief in the necessity of self-defense could not be based on delusion alone.[10]  None of these instructions would have made sense if the jury understood

_____

[10]     The pertinent jury instructions were as follows:  "You have received evidence regarding a mental disease or mental disorder of the defendant at the time of the commission of the crime charged in count one, namely murder, or a lesser crime thereto, namely voluntary manslaughter.  You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated or harbored malice aforethought, which is an element of . . . murder."

After a series of instructions on the homicide offenses, the court then told the jury:  "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril or great bodily injury kills unlawfully but does not harbor malice aforethought [and] is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

*(footnote continued on next page)*

18

that defendant was conclusively presumed to be free of mental disease or disorder. Thus, when considering the instructions on mental state and mental disease evidence, the jury would not have tended to believe that the presumption of sanity barred it from considering the evidence of defendant's mental illness and its impact on his claim of unreasonable self-defense.

Whether or not the instructions as a whole were sufficient to overcome the effect of the presumption of sanity instruction, however, the manner in which this case was tried leaves us confident there is no reasonable likelihood that the jury gave effect to the conclusive presumption. Defense counsel strongly urged the jury to consider the mental health evidence in determining whether defendant had

_(footnote continued from previous page)_

"As used in this instruction, an imminent peril or danger means one that is . . . apparent, present, immediate, and must be instantly dealt with or must so appear at the time to the slayer.

"For the purpose of reaching a verdict in the guilt phase of this trial, you are to conclusively presume that the defendant was legally sane at the time the offenses [are] alleged to have occurred.

"In the guilt phase, any expert testifying about a defendant's mental disorder shall not testify as to whether the defendant had or did not have the required mental state. The question as to whether the defendant had or did not have the required mental state shall be decided by the trier of fact, which in this case is the jury.

"A hallucination is a perception that has no objective reality. If the evidence establishes that the perpetrator of an unlawful killing suffered from a hallucination which contributed as a cause of the homicide, you should consider that evidence solely on the issue of whether the perpetrator killed with or without deliberation and premeditation.

"If you find that a defendant received a threat from a third party that he actually, even though unreasonably associated with the victim, . . . you may consider that evidence in evaluating the defendant's actions. The weight and significance of such evidence is for you to decide.

"The defense of imperfect self-defense is not available to a defendant whose belief in the need to use self-defense is based on delusion alone."

19

acted in unreasonable self-defense. Indeed, this was the centerpiece of the defense. Perhaps more important, in her closing arguments the prosecutor mentioned the presumption of sanity only as a preliminary consideration, relating it to the bifurcated stages of trial.[11] She did not use it to attack defendant's evidence of his mental condition or his theory of unreasonable self-defense. Rather, she challenged the reliability of the defense psychologist's testimony, and argued that defendant had fabricated his claim of unreasonable self-defense. She placed great weight on the testimony of the eyewitnesses and the physical evidence, contending that defendant's version of the events was inconsistent with what others saw, with the spent shells recovered at the scene, with the wounds suffered by the victim, and with defendant's conduct after the police arrived. In light of the prosecutor's arguments challenging the merits of the defense theory, it is highly unlikely that the jury would base its decision on the presumption of sanity instead of the evidence and the proper instructions.

This case is similar in some respects to *Middleton*, which involved a faulty instruction on unreasonable self-defense to the effect that imminent peril must be evaluated by a "reasonable person" standard. (*Middleton*, *supra*, 541 U.S. at p. 435.) The high court reversed a Ninth Circuit judgment granting the defendant relief on habeas corpus. It held: "Given three correct instructions and one contrary one, the state court did not unreasonably apply federal law when it found that there was no reasonable likelihood the jury was misled." (*Id*. at p. 438.) The

---

[11] The prosecutor mentioned the presumption once, during the opening phase of her arguments: "This is really important to remember for this stage of the proceeding . . . this guilt stage. [For] the purpose of reaching your verdict during this guilt phase, the defendant is conclusively presumed to have been sane at the time he committed this crime. The insanity issue will follow. For this stage, [he is] conclusively presumed to be sane."

court further reasoned: "The Ninth Circuit also faulted the state court for relying on the prosecutor's argument, noting that instructions from a judge are presumed to have more influence than arguments of counsel. 344 F.3d, at 999 (citing *Boyde*, *supra*, at 384). But this is not a case where the jury charge clearly says one thing and the prosecutor says the opposite; the instructions were at worst ambiguous because they were internally inconsistent. Nothing in *Boyde* precludes a state court from assuming that counsel's arguments clarified an ambiguous jury charge. This assumption is particularly apt when it is the *prosecutor's* argument that resolves an ambiguity in favor of the *defendant*." (*Middleton*, at p. 438.)

Here, given the other accurate jury instructions regarding mental illness and unreasonable self-defense, and both counsel's arguments on the merits of those issues, there is no reasonable likelihood that the jury would have applied the presumption of sanity to reduce the prosecution's burden of proof. Like the *Middleton* court, we do not presume the jury blindly followed an instruction that was inconsistent with other correct instructions and the arguments of counsel. Rather, we view the record as a whole, and consider the instructions in context. This jury, which had been informed that a sanity phase would follow if defendant were found guilty, was likely to conclude that the presumption operated to preserve the issue of sanity for the appropriate phase.

### 2. *State Law*

Alternatively, defendant contends the instruction violated California law because it was irrelevant to any issue raised by the guilt phase evidence. This state law claim has not been presented or considered in previous cases touching on presumption of sanity instructions. We conclude that it has merit.[12]

---

[12] In *Coddington* and *Blacksher*, we had no occasion to consider the state law claim of error raised by defendant here. (See *Coddington*, *supra*, 23 Cal.4th at

*(footnote continued on next page)*

21

"It has long been the law that it is error to charge the jury on abstract principles of law not pertinent to the issues in the case. (*People v. Roe* (1922) 189 Cal. 548, 558.) The reason for the rule is obvious. Such an instruction tends to confuse and mislead the jury by injecting into the case matters which the undisputed evidence shows are not involved." (*People v. Jackson* (1954) 42 Cal.2d 540, 546-547; see also, e.g., *People v. Guiton* (1993) 4 Cal.4th 1116, 1129; *People v. Saddler* (1979) 24 Cal.3d 671, 681; *People v. Silver* (1940) 16 Cal.2d 714, 722; *People v. Robinson* (1999) 72 Cal.App.4th 421, 428; *People v. Barton* (1968) 261 Cal.App.2d 561, 564-565.)

The presumption of sanity is not pertinent to any issue at a trial on the question of guilt. The matter of the defendant's sanity is not before the jury, and evidence of insanity is inadmissible. (§ 28, subd. (a); *People v. Haskett*, *supra*, 52 Cal.3d at p. 232; *Wells*, *supra*, 33 Cal.2d at p. 351.) In a bifurcated trial under section 1026, it is proper to inform the jury of the procedure specified by statute, but there is no reason to tell it, before or during the guilt phase, that the defendant is conclusively presumed sane for purposes of trial.

The Legislature's intent in providing for bifurcation when a defendant pleads both not guilty and not guilty by reason of insanity was to *simplify* the issues before the jury, by "remov[ing] entirely from the first stage of the trial any issue as to legal sanity." (*Wells*, *supra*, 33 Cal.2d at p. 352.) The defendant is presumed sane for *procedural* purposes, not for any evidentiary purpose. (See *id*.

_____

*(footnote continued from previous page)*

pp. 584-585; *Blacksher*, *supra*, 52 Cal.4th at p. 831.) Therefore, neither of those cases is inconsistent with our conclusion. (See *People v. Castellanos* (1999) 21 Cal.4th 785, 799, fn. 9 [cases are not authority for propositions not considered].)

22

at p. 355; cf. *People v. Deloney* (1953) 41 Cal.2d 832, 841-842 [former § 1105 (now § 189.5) declares only a rule of procedure as to defendant's burden of going forward with evidence mitigating murder to manslaughter, and has no proper place in jury instructions].) An instruction on the presumption of sanity only complicates matters at the guilt phase by injecting the subject of sanity before it is at issue.[13]

Defendant is therefore correct that the instruction was improper on state law grounds. However, he was not prejudiced. The error of instruction on an inapplicable legal theory is reviewed under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1130; *People v. Robinson*, *supra*, 72 Cal.App.4th at p. 429.) We have explained in connection with defendant's due process argument that the jury was not reasonably likely to have applied the presumption of sanity to foreclose consideration of his mental state evidence. That analysis applies equally to the question of prejudice under *Watson*. Furthermore, the evidence of defendant's guilt was strong and direct. His inherently improbable version of the shooting conflicted with the physical evidence and the testimony of many witnesses. We are satisfied that a result more favorable to the defense was not reasonably probable absent the instruction on the presumption of sanity.

---

[13] The trial court's observation, "I don't think that you can be wrong by correctly stating the law," goes too far. A court cannot err by correctly stating the *applicable* law. The problem here is that the court instructed on a point that was not before the jury at the guilt phase.

### III.  DISPOSITION

We affirm the Court of Appeal's judgment upholding the guilty verdict.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mills

_____

**Unpublished Opinion** XXX NP opn. filed 2/28/11 – 1st Dist., Div. 2
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S191934
**Date Filed:** October 18, 2012

_____

**Court:** Superior
**County:** Alameda
**Judge:** Larry J. Goodman

_____

**Counsel:**

Kyle Gee, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon, Nanette Winaker and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kyle Gee
2626 Harrison Street
Oakland, CA  94612
(510) 839-9230

Joan Killeen
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5968