Filed 7/27/16  P. v. Alejandre CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO ALEJANDRE,<br><br>    Defendant and Appellant. | 2d Crim. No. B262253<br>(Super. Ct. No. NA097123)<br>(Los Angeles County) |

A jury convicted Gustavo Alejandre of first-degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and possession of a firearm by a felon (§ 29800, subd. (a)(1)) and found true allegations that he personally used a firearm (§ 12022.53, subd. (d)) and committed the offenses for a criminal street gang (§ 186.22, subds. (b)(1)(A), (C)).  The trial court found true a prior prison term allegation.  (§ 667.5, subd. (b).)  He was sentenced to 25 years to life on the murder count plus consecutive terms of 25 years for the firearm use and one year for the prior prison term.  The trial court stayed sentence on the gang enhancement and firearm possession count.  (§ 654.)

Alejandre contends that he was denied his privilege against self-incrimination and due process when the police circumvented *Miranda*[2] by obtaining

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

incriminating statements from him using police agents posing as inmates.  In addition, he contends that the trial court gave the jury an incorrect and misleading explanation of imperfect self-defense that violated his right to due process and a jury determination of every material issue presented by the evidence.  We affirm.

FACTS

*Prosecution Evidence*

Jesus Escapite was a member of the South Side 18th Street gang.  He told his friend Juan Canales "that he had banged on some North Side Longo."  North Side Longo was a rival street gang.  Both North Side Longo and South Side 18th Street claimed territory in Long Beach around Long Beach Boulevard and Plymouth Street, over which the two gangs regularly fought.

About two weeks later, Escapite and Canales were walking in the contested area towards a nearby liquor store.  Escapite was talking on his phone.  A blue Nissan sedan that had been parked on the street began "creeping up right behind" them.  There were two people inside the vehicle.  It appeared to be missing its front passenger hubcap.

The vehicle's occupants looked directly at Escapite and Canales and turned into an alley.  Escapite told the person on the phone, "I am going to call you back.  This mother fucker is mad dogging me."  He then told Canales, "Don't worry, I am hot right now," meaning he had a gun.

The driver got out of the car.  He said to Escapite, "Hey fool, do you remember me?  You hit me up a while ago."  As soon as he finished speaking, the driver started shooting at Escapite.  Escapite fell to the ground after the first shot.  The driver walked up to him and continued to shoot him four or five more times as he lay on the ground.

Detective Russell Moss, the first responder to the scene, found Escapite lying on his back with his arms to his side.  The bottom front part of his T-shirt was raised a little bit over his waistline.  Two inches of metal were sticking out from the zipper line of his pants.  Moss initially could not tell what it was but "had an inclination that it was a firearm."  It was the handle of a .38-caliber Smith & Wesson five-shot revolver.  Escapite

2

was transported to Long Beach Memorial Hospital. He had eight gunshot wounds, several of which caused his death.

Two and a half hours after the shooting, Officer Andrew Fox was patrolling the area looking for the shooter's vehicle. He observed Alejandre in the driver's seat of a blue Nissan sedan that was parked on the street. He recognized Alejandre as a member of the North Side Longo gang. Another male was in the passenger seat. The vehicle's front passenger hubcap was missing. Alejandre was arrested for an unrelated parole violation and taken to Long Beach Jail.

Detective Todd Johnson "placed [two individuals in Alejandre's cell] intentionally to get [him] to make some statements."[3] They were given "[a] little bit" of information before being placed in the cell. "[A]bout all they [knew]" was that "there was a shooting." Johnson engaged in "stimulation"—he would come up to Alejandre and talk about the case "so everybody hears it" and "somebody talks about it." Johnson explained, "[I]t is pretty hard for informants to start talking about murder if they don't know the guy."

After Johnson left, Alejandre told the informants, "I walked up to [Escapite] and let him have it." He added, "[T]here was another fool, but he took off running. I wasn't after his ass."

*Defense Evidence*

Alejandre testified that he knew Escapite since middle school through family ties. A week or two before the murder, Escapite shot at Alejandre and his girlfriend at the Long Beach Boulevard Market. Regarding the day of the murder, Alejandre testified, "I got [out of] my vehicle to let [Escapite] know that I knew him and we shouldn't be doing this to each other." Alejandre intended "[j]ust to slice some beef with him" because, he stated, "I was living pretty much with my girlfriend at the time, three houses away [from

---

[3] The identity of these individuals is unclear from the record. Defense counsel stated, "[I]t appears that, I believe even the detective acknowledged that one of the individuals though was posing as an inmate or as an undercover officer or another inmate was wearing a wire in which statements were made." The trial court "accept[ed] [defense counsel's] factual assertions" that both individuals "were police agents," as do we.

Escapite]." Alejandre believed that unless they made "peace," Escapite "would have shot at [him] or [his] girlfriend."

Alejandre stated, "I just told [Escapite], hey, you don't remember me. [H]e didn't really let me finish. He just reached for his waistband. That's when I reached for my gun." Alejandre "knew [Escapite] was going to shoot [him] if [he] didn't shoot [Escapite]."

Alejandre shot Escapite once or twice and "thought about walking off" but saw Escapite was still reaching for his waist. Alejandre did not want to "get shot in the back" so he "kept shooting him a couple more times." Afterwards, Alejandre did not "stick around" because, as an admitted gang member, he did not think the police would believe anything he said about the incident.

## DISCUSSION

### *Miranda Violation*

The trial court denied Alejandre's motion to suppress the incriminating statements he made to the jailhouse informants. Alejandre contends the admission of these statements violated his privilege against self-incrimination and right to due process. He argues that before administering the *Miranda* warnings, Detective Johnson "engaged in the functional equivalent of interrogation by making direct and indirect accusations against [him] for the specific purpose of provoking incriminating statements" to the jailhouse informants.

The Fifth Amendment guarantees that a criminal defendant may not "be compelled . . . to be a witness against himself." (U.S. Const., 5th Amend.) This precludes the prosecution from using "statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda*, *supra*, 384 U.S. at p. 444.) Such procedural safeguards include, prior to any questioning, a warning "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Ibid.*)

4

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," i.e., "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301.) "[W]e defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence," and "independently determine whether the challenged statement was obtained in violation of *Miranda's* rules." (*People v. Weaver* (2001) 26 Cal.4th 876, 918.)

"*Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Illinois v. Perkins* (1990) 496 U.S. 292, 294 (*Perkins*).) "This is because *Miranda* warnings serve to dispel the coercive effect of *police custodial* questioning. Both adjectives are crucial: *Miranda* does not apply to noncustodial police interrogation or to nonpolice custodial interrogation. When a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent." (*People v. Williams* (1988) 44 Cal.3d 1127, 1142.)

Alejandre relies on dicta from our Supreme Court "that when an accused is in custody and confides in a government agent who is 'ostensibly no more than a fellow inmate' [citation], his statements may be deemed involuntary even though there is no coercion. The accused may well make 'voluntary' statements when he believes he is conversing with an ally. Yet by purposefully creating a false sense of security, the state is in a sense causing or compelling the accused to speak when he would not otherwise do so." (*People v. Whitt* (1984) 36 Cal.3d 724, 745-746.) Yet *Perkins*, which controls here (see *People v. Sims* (1993) 5 Cal.4th 405, 440 (*Sims*) ["We apply federal standards in reviewing [a claimed] violation of *Miranda*"]), is incompatible with such an approach.

In that case, as here, a detainee "was being held pending trial." (*Perkins*, *supra*, 496 U.S. at p. 294.) "The police wanted to investigate further [the detainee's] connection to [an unrelated] murder," and executed a plan "to place an undercover agent in

the cellblock with [the detainee]. The plan was for [a cellmate informant] and [the] undercover agent . . . to pose as escapees from a work release program who had been arrested in the course of a burglary. [They] were instructed to engage [the detainee] in casual conversation and report anything he said about the . . . murder." (*Id.* at pp. 294-295.)

The only way in which this case differs from *Perkins* is that here the police officer spoke with the detainee before leaving him alone with the undercover agents. Alejandre argues that this difference is dispositive because "confronting [a] defendant with the evidence linking him to the crimes" amounts to "the application of a 'technique of persuasion' viewed by United States Supreme Court decisions as likely to induce [the] defendant to attempt to defend—and thus incriminate—himself." (*People v. Sims*, *supra*, 5 Cal.4th at pp. 443-444.) Accepting for the sake of argument that Detective Johnson's discussion of the evidence with Alejandre was improper (but see 2 Ringel, Searches and Seizures, Arrests and Confessions (2nd ed. 1979) § 25:9 ["Courts are unanimous in holding that confronting the defendant with evidence of guilt is not coercive conduct on the part of the police and does not render a subsequent confession involuntary"]), *Sims* itself explains why exclusion of Alejandre's subsequent statements was inappropriate.

" '[N]ot . . . all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' [Citations.] The degree of attenuation that suffices to dissipate the taint 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the [subsequent] confession is not in fact obtained by exploitation of the illegality." (*Sims*, *supra*, 5 Cal.4th at p. 445.) Here, the Fifth Amendment problem with Johnson's statements to Alejandre was the likelihood that they would cause Alejandre to defend himself *to Johnson*. This causal chain was broken when Johnson left and, from Alejandre's perspective, two fellow inmates struck up a casual conversation about the

6

murder. (See *Perkins*, *supra*, 496 U.S. at p. 296 ["Coercion is determined from the perspective of the suspect"].)

Alejandre argues that his "testimony made it clear that he felt intimidated by the undercover agents because . . . he believed he needed to 'up the ante' and build himself up as a gang member in front of the other men." His trial testimony was not before the trial court when it denied his suppression motion, however, and even if it had been, the trial court was free to discredit his self-serving statements. In the recording of his conversation with the undercover agents, all three men were laughing and speaking freely. At trial, Alejandre explained why he did not tell the agents that he shot Escapite in self-defense: "It really didn't make no sense for me to tell [them] any of that. . . . I was just trying to boost myself up as a gang member in front of [them]." "*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." (*Perkins*, *supra*, 496 U.S. at p. 298.)

Alejandre analogizes the police technique used here "to the two-step procedure that the United States Supreme Court denounced for intentionally undermining *Miranda*" in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). *Seibert* is inapposite because it involved interrogation by persons the suspect knew to be police officers. After the police broke the suspect down and elicited an inadmissible confession, they provided the *Miranda* warnings and led the suspect to cover the same ground a second time in the hope that the subsequent confession could be admitted. (*Id.* at p. 604.) Here, the police did not extract a confession from Alejandre; the undercover agents did. As we have explained, there was a break in the causal chain between any undue influence that Detective Johnson exerted on Alejandre and his subsequent confession. In *Seibert,* "[i]t would have been reasonable to regard the two sessions as parts of a continuum." (*Id.* at pp. 616-617.) Here, it would not be. Alejandre's statements were properly admitted.

*Jury Instructions*

Alejandre contends that the trial court made confusing comments on a jury instruction that violated his federal and state due process rights, his Sixth Amendment right to a jury trial, and his Eighth Amendment right to a reliable verdict. "A defendant

7

challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) In evaluating the likelihood of a misunderstanding, we consider the jury instructions as a whole, the arguments of counsel, and the entire record. (*People v. Mills* (2012) 55 Cal.4th 663, 680.) We assume jurors will exercise intelligence and common sense. (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) We review the propriety of jury instructions de novo. (*People v. Leeds* (2015) 240 Cal.App.4th 822, 830.)

The trial court started to instruct the jury with CALJIC No. 5.17: "A person who kills another person in the actual but unreasonable belief in the necessity to defend himself against imminent peril to life or great bodily injury, kills unlawfully but does not have or harbor malice aforethought and it is not guilty of murder." It then stopped reading the instruction and made the following comments:

"This is a theory of voluntary manslaughter. And this is where it gets, to me, anyway, you may find it not so, to me, anyway, a little strange. Murder is the unlawful killing of a human being with express malice. Put implied malice aside. Express malice. That means a specific intent to kill.

"So, if express malice means a specific intent to kill, how do you get rid of malice aforethought and still have a specific intent to kill? And you have to do that in your head to get to voluntary manslaughter. You get rid of that category, express malice. I mean, get rid of that category, malice aforethought. Even though it means express malice, a specific intent to kill, but you still retain a specific intent to kill.

"How many angels dance on that pin? Keep that in mind. It really makes sense if you think about it. It just takes away that thing called malice aforethought. And you got to have malice aforethought for the crime of murder."

8

The trial court then read CALJIC No. 5.17 in its entirety.[4]

Alejandre claims that "[t]he trial court's comment about the strangeness of imperfect self defense and voluntary manslaughter was very likely to lead jurors to question the validity of a defense based on unreasonable but good faith belief in the need for self defense." Taken in context, the trial court's comment that "this is where it gets . . . a little strange" was not misleading.

Immediately prior to instructing the jury, the trial court stated, "There are some words and phrases that I am going to use that are going to sound strange to you. And the one I have in mind is the definition of murder which is the killing of a human being with malice aforethought. It isn't what you think. You can't intuit. You can't figure it out for yourself. You have to stick with some definitions that I am going to give you. But a lot of this, what I am going to read to you is common sense. You will find that while you may struggle initially with coming to grips with some of the ideas, that your sound intelligence and good common sense will get you to wherever you have to go." The trial court's reference to "strange" was simply a warning to the jury that the court was about to explain an idea that was not intuitive and that jurors would need to pay attention to the definition of imperfect self-defense.

Alejandre also argues that the trial court's commentary misled the jury to believe that something more than an actual but unreasonable need to act in self-defense

---

[4] "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully but does not harbor or have malice aforethought and is not guilty of murder. [¶] This would be so even though a reasonable person in the same situation, seeing and knowing the same facts would not have had the same belief. [¶] Such an actual, but unreasonable belief, is not a defense to the crime of voluntary manslaughter.

"As used in this instruction, imminent peril or danger means one that is apparent, present, immediate and must instantly be dealt with or must so appear at the time to the slayer.

"However, the principle is not available and malice aforethought is not negated if the defendant, by his wrongful conduct, created the circumstance which legally justified his adversary's use of force or attack.

"This principle applies equally to a person who kills in purported self-defense or purported defense of another person."

9

was required for a verdict of voluntary manslaughter. We disagree. The trial court's statement, "you have to do that in your head to get to voluntary manslaughter," did not, as Alejandre maintains, "suggest[] the jurors must engage in complicated mental gymnastics to reach a verdict of voluntary manslaughter." It merely reassured the jurors that the concept of voluntary manslaughter "really makes sense if you think about it. It just takes away that thing called malice aforethought." There is nothing untoward about a trial court cautioning the jury that a particular legal concept is complicated.

The jury instructions were not misleading. That one juror conducted online research on the definition of manslaughter does not suggest otherwise.[5] The juror's focus was on accusing the other jurors of bias and he "quoted the [online] definition [of manslaughter] as saying that all of [the] jurors have biases and . . . make . . . decisions based on [them]." There is no indication in the record that any juror—including him—had difficulty understanding the trial court's instruction on imperfect self-defense.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

TANGEMAN, J.

---

[5] The juror was dismissed for misconduct and replaced with an alternate juror. The trial court instructed the jury to begin deliberations anew and "to put out of your minds whatever [the dismissed juror] may have said . . . about his research and [to] conduct . . . deliberations in that fair and impartial manner that each party deserves."

10

Arthur H. Jean, Jr., Judge

Superior Court County of Los Angeles

_____

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.