Filed 11/15/23  P. v. Leonard CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEROME ANTHONY LEONARD II,<br><br>Defendant and Appellant. | A165892<br><br>(Napa County Super. Ct. No. 20CR002588) |

Jerome Anthony Leonard II appeals after a jury convicted him of mayhem (Pen. Code, § 203; count one)[1] and assault with a deadly weapon (§ 245, subd. (a)(1); count two).  Leonard challenges a jury instruction on self-defense.  We conclude that any error was harmless and affirm.

### BACKGROUND

### A.

On September 13, 2020, P.M. and her teenage daughter were shopping at a grocery store in American Canyon.  As P.M. pushed her cart into the bakery aisle, she encountered Leonard and his fiancée.  Leonard's fiancée turned and looked P.M. "up and down," giving her "dirty looks."  Leonard then turned around and asked P.M., " 'bitch, what are you looking at[?]' "  He continued to harass P.M., using a loud voice and profanity.

---

[1] Undesignated statutory references are to the Penal Code.

1

P.M. felt uncomfortable and afraid. When Leonard said, " 'I should go ahead and slap you,' " P.M. told him to "go ahead." But she also walked away to another aisle and called her husband, M.M. P.M. told M.M. that there was a couple at the store who were harassing her and that the man involved threatened to " 'slap the shit out of [her].' " Leonard and his fiancée took video of P.M. on their cell phones and continued berating her. At this point, the assistant store manager approached and told P.M. that the police were on their way. He directed P.M. and her daughter to wait at the front of the store.[2]

M.M. testified that P.M. sounded "terrified" on the phone, and he decided to go to the store. He also called P.M.'s older brother, Robert Cuenca. M.M. told Cuenca that someone at the store was calling P.M. a "bitch" and threatening to " 'slap the shit out of [her].' " After speaking to M.M. and P.M., who sounded "really scared," Cuenca also drove to the store.

When M.M. arrived at the store, P.M. pointed out Leonard and his fiancée. M.M. spoke with Leonard while Leonard's fiancée continued recording with her cell phone. The interaction quickly escalated to loud yelling and an exchange of profanity. A crowd gathered.

When Cuenca arrived, he saw Leonard "towering [over]" M.M. Both men were shouting and arguing aggressively. M.M. testified that Leonard yelled, "[y]ou ain't going to do nothing" and "[y]ou ain't going to do shit." Cuenca first slapped the phone out of Leonard's fiancée's hand. Witness testimony diverges as to

---

[2] A recording of the assistant manager's 911 call was played for the jury. In the call, which lasted several minutes, the manager first reports a man inside the store repeatedly harassing other shoppers and attempting to "escalate" to physical violence. While loud voices are heard in the background, the manager reports that the man just said that he was going to kill another man with whom he was arguing.

what happened next, however. P.M. testified that she heard Cuenca yell, "he has a knife." She then saw Leonard on top of Cuenca.

Cuenca testified that, after swatting the phone out of Leonard's fiancée's hands, he told Leonard to shut up and "square up." Leonard stepped backwards and held his hands above his head, in what Cuenca described as a "fighting style[.]"[3] Cuenca, who was not armed, then punched Leonard in the face. Next, Leonard stepped back, lifted his shirt, and pulled out a knife. Cuenca yelled, "knife" and tried to disarm him, by taking the knife, but was unsuccessful. The men fell to the floor, with Leonard on top. Leonard hit Cuenca twice. Cuenca testified that, when he punched Leonard, he expected Leonard to fight back. But he did not expect him to have a knife or use any other weapon.

M.M. testified that he saw Cuenca and Leonard on the ground and then heard Cuenca yell, " 'knife[!]' " M.M. grabbed Leonard and tried (unsuccessfully) to pull him off Cuenca. A sheriff's deputy eventually separated the three men. M.M. testified that he may have yanked on Leonard's neck when he was trying to pull him off Cuenca. As Cuenca stood up, he kicked Leonard. At this point, Cuenca was already cut and bleeding.

Another customer of the grocery store also saw the fight. First, he saw Leonard "screaming and yelling" in the produce department. He believed Leonard and his fiancée "were doing all the provoking." The customer saw Cuenca throw the first punch

---

[3] Surveillance video from the grocery store, along with recordings from the responding deputies' body cameras, were played for the jury. The surveillance video evidence shows that Leonard's hands were in the air and that his hands were not balled into fists. However, the footage nonetheless corroborates the witnesses' testimony that Leonard's body language and movements continued to be combative.

and strike Leonard. The two men exchanged a few blows. Leonard fell back against a vegetable display but did not lose his footing. According to the bystander, Leonard then "popped back up [and] . . . pulled his knife and stuck [Cuenca]." The witness explained that he saw Leonard lift his shirt, draw a knife from a sheath, and then stab Cuenca in the chest (while the two men remained standing). As the men went to the ground, Leonard was on top of Cuenca at first, but did not stop stabbing him. Leonard "just [kept] on going." It appeared to the customer that Leonard was not "just trying to stop" Cuenca but was "trying to hurt him bad."

Several deputies from the Napa County Sheriff's Department responded. The deputies testified that Cuenca initiated the physical fight—by throwing the first punch. Deputy Marcus Solis pushed M.M. off Leonard around the same time that he heard someone yell, "he's got a knife." Solis saw that Leonard was holding a knife, with a three-inch blade, in his right hand. Solis drew his firearm and detained Leonard. Another deputy helped pull M.M. off the top of the "dog pile" and then extricated Cuenca, who was bleeding.

Cuenca suffered stab wounds to his chest and shoulder, a cut on his bicep, and a laceration that cut one of his ears in half and went all the way down to his neck. Cuenca was transported to the hospital, in an ambulance, where he stayed for one or two nights. His right ear was almost severed. Staples were needed to close the cuts to Cuenca's shoulder and chest. The injuries continued to cause him pain at the time of trial. Leonard suffered cuts to his thumb and thigh.

The video evidence generally corroborates the testimony given by Cuenca, M.M., and the bystander—including that, at the end of the fight, Leonard was on top of Cuenca and holding the knife. However, none of the video footage captures the stabbing or what happened when Leonard and Cuenca first fell the floor.

4

## B.

Leonard did not testify or present any other evidence in his defense. However, defense counsel argued to the jury that the prosecution had failed to meet its burden of proving, beyond a reasonable doubt, that Leonard did not act in lawful self-defense. Specifically, defense counsel argued: "[T]his is a very clear case of self-defense. No physical contact occurred until Mr. Cuenca entered. Mr. Cuenca punched Mr. Leonard in the face. Mr. Cuenca knew that Mr. Leonard had a knife. He knew that Mr. Leonard was backing up, but he decided to approach Mr. Leonard, to tackle him and try to get his knife. And, you know, he succeeded. He succeeded, and then Mr. Leonard was stabbed at some point."

The jury convicted Leonard on both counts and found the charged enhancement allegations—for personally inflicting great bodily injury (§ 12022.7, subd. (a)) and personally using a deadly weapon (§ 12022, subd. (b)(1))—true. The trial court sentenced Leonard to an aggregate prison term of five years.

### DISCUSSION

#### A.

Leonard contends that the trial court prejudicially erred by giving the jury a "legally incorrect" special instruction that deprived him of his self-defense claim. We disagree.

#### 1.

Trial courts have no sua sponte duty to give pinpoint instructions. But when a court chooses to give a requested pinpoint instruct, its instruction must be legally correct. (*People v. Pearson* (2012) 53 Cal.4th 306, 325.) We review jury instructions de novo to assess whether the challenged instruction accurately states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The correctness of jury instructions is to be determined from the entire set of instructions given by the court, " 'not from a

5

consideration of parts of an instruction or from a particular instruction.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 192.) A court also errs if it charges the jury on abstract principles of law not relevant to the case (*People v. Mills* (2012) 55 Cal.4th 663, 680) or if its instructions are not only irrelevant " 'but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681.)

Here, the jury was instructed on, among other things, the elements of mayhem and assault with a deadly weapon. The jury also received standard instructions on self-defense: CALCRIM No. 3470 (right to self-defense or defense of another (non-homicide)); CALCRIM No. 3471 (right to self-defense: mutual combat or initial aggressor); CALCRIM No. 3472 (right to self-defense: may not be contrived); and CALCRIM No. 3474 (danger no longer exists or attacker disabled). Most importantly, the jury was instructed that the prosecution bore the burden of proving, beyond a reasonable doubt, that Leonard did not act in self-defense.

In particular, the jury was instructed (in relevant part), pursuant to CALCRIM No. 3470: "Self-defense is a defense to [counts one and two] and [the] lesser [included] offense[s]. *The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense.* The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used *no more force than was reasonably necessary* to defend against that danger. [¶] . . . The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. *If the defendant used*

6

*more force than was reasonable, the defendant did not act in lawful self-defense.* [¶] . . . [¶] *The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty* of [counts one and two and the lesser included offenses]." (Italics added.)

CALCRIM No. 3472 instructed the jury: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." The trial court also gave a special instruction, based on CALJIC No. 5.31, which read: "An assault with fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believes, and a reasonable person in the same or similar circumstances would believe, that the assault is likely to inflict great bodily injury upon him."

CALCRIM No. 3471 further informed the jury: "A person who starts a fight has a right to self-defense only if, one, he actually and in good faith tried to stop fighting, and two, he indicated by word or conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting, and that he had stopped fighting. If the Defendant meets these requirements, he then has a right to self-defense if the opponent continued to fight." The trial court did *not* give the bracketed language in the form instruction, which provides an initial aggressor with the following exception to the withdrawal and notification requirements: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop the opponent, or give the opponent a chance to stop fighting." (CALCRIM No. 3471; see *People v. Hecker* (1895) 109 Cal. 451, 463-464.)

7

Instead, on the prosecutor's request, the trial court gave a special instruction that included modified language taken from CALJIC No. 5.54. The challenged special instruction provides: "When the victim of a simple assault indulges in a sudden and deadly counter assault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense." The prosecutor explained, "the jury is . . . not going to be instructed that Robert Cuenca had the right to self-defense once the deadly weapon was introduced . . . into the fight, unless they get some law on it." Defense counsel's objections—that it was improper to mix CALCRIM and CALJIC instructions and that Cuenca's claim to self-defense was not relevant (because he had not been charged)—were overruled.

**2.**

Leonard's challenge is only to the special instruction modeled on language in CALJIC No. 5.54. We conclude that any instructional error was harmless.

Leonard's argument is not a model of clarity. Leonard suggests that the trial court erred by mixing the two sets of model instructions. He also contends that the special instruction, "as it was deployed by the prosecution" in this case, was incorrect and misleading because—by referring to an "original aggressor" rather than "a *defendant* who is the original aggressor"—it directed jurors to view the evidence from Cuenca's perspective, rather than Leonard's, and thereby improperly shifted the burden away from the People—who bore the burden to prove that Leonard was not acting in lawful self-defense.

First, Leonard is wrong to suggest that it necessarily constitutes error to give a CALJIC instruction with CALCRIM instructions. He is correct that the CALCRIM usage guide cautions that CALCRIM and CALJIC instructions "should never be used together." (Guide for Using Judicial Council of Cal. Criminal Jury Instructions, p. 2, italics omitted.) It might be the

8

better practice to follow such advice, but this does not mean that any of the CALJIC instructions are necessarily defective. (See Cal. Rules of Court, rule 2.1050(f); *People v. Lucas* (2014) 60 Cal.4th 153, 294 [CALJIC instructions did not " ' become inadequate to inform the jury of the relevant legal principles or too confusing to be understood' "], disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Thomas* (2007) 150 Cal.App.4th 461, 465–466 ["Judicial Council's adoption of the CALCRIM instructions did not render any of the CALJIC instructions invalid or 'outdated' "].)

Second, Leonard does not otherwise meet his burden to show that the instruction's language was legally incorrect. Leonard acknowledges that the challenged instruction's language was taken directly from *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75, which remains good law. (See also *People v. Hecker, supra,* 109 Cal. at pp. 463-464; *People v. Quach* (2004) 116 Cal.App.4th 294, 301-303.) And he does not cite any authority for the proposition that a trial court errs by instructing the jury on self-defense in abstract language rather than in language focused solely on the defendant. In fact, several of the CALCRIM self-defense instructions are themselves phrased in similar language—using "a person" instead of "the defendant." (See, e.g., CALCRIM No. 3472.)

Nonetheless, the People concede that there was no evidentiary basis for the challenged instruction because Cuenca was undisputedly the initial aggressor and his claim to self-defense was irrelevant, in that he was not accused of any crime. We agree that the trial court's decision to give the challenged instruction was unsupported by the evidence but conclude that the error in giving an irrelevant instruction is merely technical and not grounds for reversal. (See *People v. Cross* (2008) 45 Cal.4th 58, 67; *People v. Crandell* (1988) 46 Cal.3d 833, 872.) We presume the jury disregarded any inapplicable instruction

9

because it was instructed, pursuant to CALCRIM No. 200, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case," and that the jury should "follow the instructions that do apply to the facts as you find them."

We do not agree with Leonard that the challenged instruction misdirected the jury to find that he had no right to self-defense *without considering* whether the prosecution had met its burden to prove that Leonard used more force than was reasonably necessary to defend against the danger posed by the punches Cuenca threw. (See CALCRIM No. 3470.) Leonard contends that, as a result, the trial court's instructional error violated the constitution, and that reversal is mandated unless the People demonstrate the error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.)

In contrast to the cases Leonard cites, which involved failure to instruct on a relevant defense, the jury in this case received complete and correct instructions on self-defense. Nothing in the challenged instruction supports Leonard's burden-shifting interpretation. The instruction only states: "When the victim of a simple assault indulges in a sudden and deadly counter assault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense." And, in fact, the jury was correctly (and repeatedly) instructed that the prosecution bore the burden of proving, beyond a reasonable doubt, that Leonard did not act in self-defense.

True, the prosecutor did argue that "the right of self-defense can shift from one person to another." The prosecutor continued: "So *determine if Defendant Leonard exceeded the limits of self-defense.* It's not all absolute, there are limits. Determine if Robert Cuenca had the right to lead with self-defense. *It shifts. If Robert Cuenca had a right to self[-defense] at any point, it*

10

*means Defendant Leonard lost the right*; therefore, *using an amount of deadly force that is not legal under the law*, and therefore, he's guilty of the crimes." (Italics added.)

These comments may be confusing in isolation. However, we must read the prosecutor's comments in context. The prosecutor's argument was primarily focused on two points: (1) Leonard had no valid claim of self-defense because his use of deadly force was excessive and not reasonably necessary to defend against the danger posed by a fistfight with (unarmed and smaller) Cuenca (see CALCRIM No. 3470); and (2) Leonard had no valid claim of self-defense because he provoked a fight with the intent to create an excuse to use force. (See CALCRIM No. 3472.) Furthermore, the prosecutor explicitly acknowledged that it was his burden to prove, beyond a reasonable doubt, that Leonard was not acting in self-defense.

In context, we understand the prosecutor's argument to be merely that Leonard used more force than was reasonably necessary to defend against the danger presented by a fistfight and thereby exceeded the limits of lawful self-defense. There is no likelihood that the jurors were misled by the challenged special instruction to believe that Leonard had no right to self-defense if, in stabbing Cuenca, he reasonably believed he was in imminent danger of suffering bodily injury, reasonably believed that the immediate use of force was necessary to defendant against that danger, and used no more force than was reasonably necessary. We must presume jurors understand and follow the instructions they are given rather than speculate that they were misled by brief and isolated statements made during argument. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431; *People v. Mendoza* (2000) 24 Cal.4th 130, 173.)

Finally, we note that Leonard does not raise any claim of prosecutorial misconduct based on the prosecutor's statements in closing argument. Any such argument has been forfeited because

11

it was not raised in Leonard's opening brief on appeal *and* because defense counsel did not object to the prosecutor's argument (much less seek an admonition) below. (See *People v. Clark* (2016) 63 Cal.4th 522, 552 [argument forfeited by failure to raise it in opening brief on appeal]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305 [to preserve claim of prosecutorial misconduct for appeal, criminal defendant must make a timely and specific objection and ask trial court to admonish jury to disregard improper argument].) Leonard's appellate counsel asserted, at oral argument, that any objection to the prosecutor's argument would have been futile. But the record does not support counsel's claim. In objecting to the special instruction, Leonard's counsel had only argued that Cuenca's claim to self-defense was irrelevant and that it was problematic to mix CALCRIM and CALJIC instructions. Defense counsel never argued that either the instruction or the prosecutor's argument suggested Leonard bore the burden of proving self-defense.

It is not reasonably probable that Leonard would have achieved a more favorable result in the absence of any instructional error.

## DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:

SIMONS, ACTING P.J.
CHOU, J.

*People v. Jerome Anthony Leonard II* (A165892)