Filed 9/9/25  P. v. Valdez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUAN ANDRES VALDEZ,<br><br>Defendant and Appellant. | F087719<br><br>(Super. Ct. No. BF195633A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Jake Stebner; Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On July 13, 2023, Juan Andres Valdez stabbed Maria Valdez, his grandmother, in the head.  The parties stipulated that Maria[1] died from a stab wound to the head and that the manner of death was homicide, but Valdez argued that he did not act with malice aforethought because he suffered from a mental disease, defect, or disorder.  Valdez was ultimately convicted of second degree murder.  On appeal, Valdez argues that the trial court violated his rights under the United States Constitution and California law by instructing the jury that he was "conclusively presumed to have been legally sane at the time of the offense."  The People disagree.  We reverse.

## PROCEDURAL HISTORY

On November 22, 2023, the Kern County District Attorney filed an information charging Valdez with murder (Pen. Code,[2] § 187, subd. (a); count 1).  The information also alleged that Valdez personally used a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)).

On February 6, 2024, Valdez was found guilty of murder by a jury.  The jury also found true the allegation that Valdez personally used a deadly weapon.  On March 7, 2024, the trial court sentenced Valdez to a term of 15 years to life, plus one year.  On that same day, Valdez timely filed a notice of appeal.

## FACTUAL SUMMARY

**The Prosecution's Case**

On July 13, 2023, Valdez called 911.  He told the operator that he had hurt his grandmother (Maria).

When Bakersfield police officers arrived at the scene, Valdez walked towards the officers with his hands in the air.  An officer told Valdez to sit on the sidewalk curb, and

---

[1]  As appellant Juan Andres Valdez and Maria Valdez share a last name, we refer to Maria by her first name.  No disrespect is intended.

[2]  All further undesignated statutory references are to the Penal Code.

Valdez complied. An officer asked Valdez what happened and who was inside the residence. Valdez told the officer that his grandmother was inside the residence. He also told the officer that "he became scared of her," and "he said something along the lines [*sic*] regarding child abuse." After he was detained, Valdez accurately provided his name and date of birth.

Maria was alive, but she was not communicative. She was taken to the hospital via ambulance. She had two wounds. Both were approximately an inch in width. One was just above her left ear, and it did not penetrate the skull. The other was near her left temple, and it punctured her skull and brain. The parties stipulated that she died on July 21, 2023, from a stab wound to the head, and that the manner of death was homicide.

A knife was found in the kitchen sink. The blade was approximately 120 millimeters long. "It appeared that the knife had … a rust colored … tinge to it, but it was wet; so it looked like it may have been rinsed."

Officer Christina Perkins, a senior City of Bakersfield police officer, interviewed Valdez. Valdez lived with Maria since he was three years old. At the time, he was 31 years old. He had attended high school, but he only completed the 10th grade. He was not employed. He received social security disability benefits because he had anxiety, nervousness, and insomnia. He saw a doctor monthly, and he had been prescribed Seroquel and Trazodone. He enjoyed playing video games and smoking cigarettes.

Because Valdez had a limited education, was receiving disability benefits, was slow to respond to Perkins's questions, and may not have understood some of the questions, Perkins decided to conduct a juvenile voir dire "to ensure he had the mental capacity to move forward with [the] interview." A juvenile voir dire consists of "basic questions in regards to whether [interviewees] know right from wrong, a truth and a lie, the difference between a good and a bad touch, and then whether they know the consequences of their actions." After asking Valdez one of the questions, such as if he

knew what a truth is, she would ask for an example. Throughout the questioning, Valdez "understood and was able to provide an example for everything that [she] asked."

So, Perkins asked Valdez to tell her what happened. "He said he was pacing in his bedroom. He said he was overcome with fear, and basically he said that he went and exited his bedroom, was in the hallway when he decided that he needed to get a knife, because the only way that he [could] get rid of that fear was to move the victim out of the way so that he could get away from her, and so he would need to hurt her to do that." Valdez went into the kitchen and grabbed a knife. He then went into the living room, where Maria was sleeping on the couch, and stabbed her in the head. The knife went into her head. "[S]he sat up and started yelling and groaning." Valdez then went back to the kitchen and put the knife in the sink. After that he looked for Maria's cellphone so he could call an ambulance for her.

When Valdez talked about his need to "get the fear out of him," he "described that he hears voices." And on that day, "the voices got really bad."

When Perkins asked Valdez why he stabbed Maria, "[h]e said he didn't mean to hurt her or he didn't want to hurt her; however, he needed to get the fear out of him. He also stated that he was just trying to scare her to have her go away." Despite this, when asked, he acknowledged that a knife could cause death or serious injury. He also stated that he was under pressure and did not see any other option but to stab Maria.

Valdez also told Perkins that he was scared of Maria "because she had more authority than him" and because "she put him down." "[S]he made all the decisions," and he was scared of "messing up." She hurt his feelings by not helping him and not giving him what he wanted. Earlier that day, he got into an argument with Maria because she would not give him enough money to buy "cigarillos." However, she eventually gave him the money.

During the interview, Valdez was "very quiet and showed no emotion." He told Perkins that "he was scared because he actually hurt someone in real life."

**Valdez's Case**

Valdez called Dr. Michael Musacco, a clinical psychologist, as a witness. Dr. Musacco evaluated Valdez on October 31, 2023. Dr. Musacco also reviewed a police report from this case and Valdez's psychiatric records.

The records went back about 10 years. "[F]rom the outset of [Valdez's] mental health treatment records, [Valdez] presented with symptoms of schizophrenia." His symptoms "included auditory hallucinations or hearing voices that aren't there. They included delusional beliefs or paranoid thought processes, meaning that [Valdez] would experience fear concerning that other people were trying to harm him in absence [of] any realistic basis for that." In addition to auditory hallucinations and delusional beliefs, schizophrenia has "negative symptoms," which refer "to something that is absent, not there." "So you'll see people with a major mental illness[,] they have a flat affect. There is not much in the way of display of emotion. Their thoughts are impoverished; so there is not much in the way of telling you how they are saying or thinking, and the progress notes with [Valdez] really described those negative symptoms, that he wasn't putting much out there. There wasn't … a lot going on in terms of his ability to interact or express himself." Valdez also "discussed having difficulties with sleep and emotional upset, anxiety, depression, and that is the theme of the symptoms that [were] presented throughout the documented treatment records."

Overall, Valdez had been diagnosed with schizophrenia, anxiety disorders, and depressive disorders. At or around the time of the incident, Valdez was taking Seroquel, an antipsychotic medication, and Trazodone, "a combination of an antidepressant and a sleep aid."

During Dr. Musacco's interview with Valdez, Valdez told Dr. Musacco that Maria was controlling, and he did not want to put up with it anymore. He constantly argued with Maria, and he needed to get away from her. On the day of the incident, "the voices were telling him to stab her, to take her out." Valdez "snapped." He "went insane" and stabbed Maria. However, he also stated that he did not intend to kill Maria.

Dr. Musacco "offered the diagnosis of schizoaffective, which is kind of a kissing cousin to schizophrenia, but when a person has all the … diagnosed criteria for schizophrenia, and they are also showing prominent symptoms of depression," it is referred to as "schizoaffective disorder." Dr. Musacco also concluded that Valdez's schizophrenia "was severe in magnitude." "A person who has a more severe form of schizophrenia, their ability to have … ordinary life activities is more impacted, and in [Valdez's] case, he never got married, he never had a job, he didn't have friends, he didn't have hobbies, he didn't have interests, he didn't leave the house. His grandmother did all of his cooking, all of his shopping, all of the laundry."

Dr. Musacco also opined that, based on Valdez's description of what occurred, Valdez was fully aware of what he was doing.

## DISCUSSION

Valdez argues that the trial court erred by instructing the jury that he was "conclusively presumed to have been legally sane at the time of the offense," the error violated both the United States Constitution and California law, and the error was not harmless. The People argue that the trial court did not err, but even if it did, the error was harmless.

## I.    Additional Background

During the jury instruction conference, the prosecutor requested a special instruction, stating that "[Valdez] is conclusively presumed to have been legally sane at

the time of the offense" (the "sanity instruction").  Defense counsel objected because the instruction was "not necessary."[3]

As relevant here, the trial court instructed the jury as follows:

> "You have heard evidence that [Valdez] may have suffered from a mental disease, defect, or disorder.  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, [Valdez] acted with the intent or mental state required for that crime.

> "The People have the burden of proving beyond a reasonable doubt that [Valdez] acted with the required intent or mental state, specifically: express or implied malice aforethought, intent to kill, and/or knowledge as referred to in [CALCRIM No.] 520.[4]  If the People have not met this burden, you must find [Valdez] not guilty of murder and involuntary manslaughter.

> "[Valdez] is conclusively presumed to have been legally sane at the time of the offense."

During his closing argument, the prosecutor argued that Valdez acted with both express and implied malice.  The prosecutor then addressed Valdez's mental illness.  During this argument, the prosecutor stated that "[t]he aspect of his mental illness can only be used for the purpose of determining whether he had malice at the time he committed the offense or whether he had intent, and, of course, intent is part of the malice."  He also stated that "[o]ne of the instructions the judge will read to you and which makes this case somewhat easier for you actually, and that is that [Valdez] is conclusively presumed to be sane.  This is not an insanity case, ladies and gentlemen.

---

[3] We note that this is the entire record as to why the instruction was given.  The prosecutor did not explain on the record why the instruction should be given, defense counsel provided minimal explanation on the record as to why it should not be given, and the trial court did not provide any explanation on the record as to why it decided to give the instruction.  In fact, the court did not specifically overrule or sustain the objection.

[4] CALCRIM No. 520 includes the elements of murder in violation of section 187.

This is not a question of whether he was sane or insane at the time. He was sane. The question is did he form the intent to do what he did, as he said that he did."

In concluding his argument, the prosecutor stated:

"[I]n summation, considering [Valdez's] mental illness doesn't help him in this case. It doesn't show that he lacked the intent. It doesn't show that he wasn't aware that at the time that he stabbed his grandmother in her sleep in the head, in the brain, pierced her skull, that somehow he was thinking he was doing something else. He knew what he was doing. It is unfortunate. It is sad. But once you consider all the evidence, apply it in the manner in which the instructions require you to apply it, that you'll find that he is guilty of each of the elements beyond a reasonable doubt, and ultimately you will have to find that he is guilty of murder."

During his closing, defense counsel argued that, because of Valdez's mental illness, Valdez did not act with express or implied malice and thus was not guilty of murder. He did not discuss sanity or the sanity instruction.

During his rebuttal, the prosecutor argued that Valdez's mental illness did not stop him from knowing what he was doing, and that he acted with express malice and implied malice. He did not discuss sanity or the sanity instruction.

## II.     Applicable Law and Standard of Review

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) Malice can be express or implied. Malice is express when the defendant intends to kill the victim. (§188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114-1115.) Implied malice has " ' "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.'[5] [Citation.] The mental component is the requirement

---

[5] "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989.)

that the defendant 'knows that his conduct endangers the life of another and … acts with conscious disregard for life.' [Citations.]" ' " (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

" 'We review a claim of instructional error de novo.' " (*People v. Parker* (2022) 13 Cal.5th 1, 66; see *People v. Cole* (2004) 33 Cal. 4th 1158, 1217.)  However, " '[i]nstructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

" 'In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.  [Citation.] Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is " 'whether the ailing instruction … so infected the entire trial that the resulting conviction violates due process.' "  [Citation.]  " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' "  [Citation.]  If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Mills* (2012) 55 Cal.4th 663, 677 (*Mills*).)

Additionally, in California, " '[i]t has long been the law that it is error to charge the jury on abstract principles of law not pertinent to the issues in the case.  [Citation.] The reason for the rule is obvious.  Such an instruction tends to confuse and mislead the jury by injecting into the case matters which the undisputed evidence shows are not involved.' " (*Mills*, *supra*, 55 Cal.4th at p. 680.)

In determining whether an error is harmless, under the more stringent standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict.

(*Ibid*.)  Under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which applies to an "error of instruction on an inapplicable legal theory," reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred.  (*Mills*, *supra*, 55 Cal.4th at p. 681; *Watson*, at p. 836.)

### III.  Analysis

The People argue that the sanity instruction "was properly given because [Valdez's] expert mentioned sanity in his testimony … and the jury needed to be told that this was a mental illness case and not a sanity case."[6]

The People are incorrect.  Our Supreme Court has held that it is error under California law to instruct the jury on the presumption of sanity during a trial on the question of guilt because the issue of legal insanity is irrelevant.[7]  (*Mills*, *supra*, 55

---

[6] We note that, aside from Dr. Musacco discussing his background, which included evaluations for "competency or sanity," it was the prosecutor who raised the issue of sanity.  When cross-examining Dr. Musacco, the prosecutor asked Dr. Musacco if Valdez stated that "[h]e snapped.  He went insane, and he stabbed her."  Dr. Musacco answered in the affirmative.  The prosecutor asked Dr. Musacco if "insane" is a clinical term.  Dr. Musacco answered, "It is a legal term."  The prosecutor asked, "[G]iven what you know about that legal term and the level of the education of [Valdez], was he speaking in the clinical sense or the legal sense or just in the layperson's sense."  Dr. Musacco answered, "I would suspect the layperson's sense."

[7] "Mental incapacity under section 26 is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b).  (*M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722; [citations].)  Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed." (*People v. Elmore*, *supra*, 59 Cal.4th at p. 140.)

Valdez did not plead not guilty by reason of insanity, so Valdez's sanity was never an issue in this case.  (§ 1026, subd. (a) ["If a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only the other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed.  If the jury finds the defendant guilty, or if the defendant pleads only not

10.

Cal.4th 663 at p. 681 ["The presumption of sanity is not pertinent to any issue at a trial on the question of guilt. The matter of the defendant's sanity is not before the jury, and evidence of insanity is inadmissible."]; see *People v. Elmore* (2014) 59 Cal.4th 121, 141 ["In *Mills*, [*supra*, 55 Cal.4th at pp. 680-681,] we held that the jury should not be instructed on the presumption of sanity at the guilt phase, because the question of legal sanity is then irrelevant."].) And even if the People are correct that the jury needed to be informed that the case involved mental illness but not sanity, neither the trial court's instructions nor the prosecutor's argument explained the difference to the jury.

As we conclude there was error, we next turn to whether the error was harmless. It was not.[8]

It was essentially undisputed that Valdez intended to, and did, stab Maria in the head. It was also essentially undisputed that this act was dangerous to human life. The only real issue before the jury was whether Valdez intended to kill Maria, or whether he knew that his conduct endangered Maria's life and acted with conscious disregard for life.

The prosecutor argued that it was "common sense" that "using that much force, that much power, that kind of weapon on a defenseless 70-year-old grandmother indicates that his intent at the time that he did that was to kill her." The prosecutor also argued that "common sense tells you if [Valdez] was consciously aware of what he was doing and he is consciously aware enough to play video games, he is certainly aware enough to know that stabbing someone with brutal force in the head could cause death, how dangerous

guilty by reason of insanity, the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court."].) Thus, if possible, the issue of sanity had even less relevance in this case.

[8] We need not determine whether the error also violated the United States Constitution, because the error was not harmless even under the less stringent *Watson* standard.

11.

that act would be." These arguments have merit. It would be eminently reasonable for a jury to conclude that if a person was, colloquially speaking, "sane,"[9] and that person stabbed a 70-year-old woman in the head with a knife that had a 120-millimeters-long blade, that person either intended to kill the woman or knew that his conduct endangered her life and acted with conscious disregard for life.

However, there was also evidence of "diminished actuality," that is, evidence that Valdez did not harbor malice aforethought due to his mental disorder. (See *People v. Elmore*, *supra*, 59 Cal.4th at p. 139 [§ 28, subd. (a) "states that evidence of mental disorders is admissible 'on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged,' a theory sometimes referred to as 'diminished actuality' "].)

According to Officer Perkins, Valdez told her that "he was overcome with fear, and basically he said that he went and exited his bedroom, was in the hallway when he decided that he needed to get a knife, because the only way that he [could] get rid of that fear was to move the victim out of the way so that he could get away from her, and so he would need to hurt her to do that." When Valdez talked about his need to "get the fear out of him," he "described that he hears voices." And on that day, "the voices got really bad." Additionally, Valdez said that "[h]e didn't mean to hurt [Maria] or he didn't want to hurt her; however, he needed to get the fear out of him. He also stated that he was just trying to scare her to have her go away." Also, while Valdez told Dr. Musacco that "the voices were telling him to stab [Maria], to take her out," he also told Dr. Musacco that he did not intend to kill her.

---

[9] Lay definitions of "sane" include "proceeding from a sound mind," "rational," and "mentally sound." (Merriam-Webster's Dict. Online (2025) <https://www.merriam-webster.com/dictionary/sane> [as of September 9, 2025], archived at: <https://perma.cc/CQE8-UE8W>.)

12.

There was also evidence to support Valdez's assertions that he did not intend to kill Maria. That is, there is strong evidence that shortly after stabbing Maria, and while she was still alive, Valdez called an ambulance for her. And while Valdez acknowledged to Perkins that the knife had the potential, or could, cause serious bodily injury or death, he did not admit that, when he stabbed Maria, he knew his conduct endangered her life or that he acted with conscious disregard for life.

Finally, there is also strong evidence that Valdez suffered from a severe mental disorder. According to Dr. Musacco, who reviewed Valdez's medical records, Valdez had presented with symptoms of schizophrenia for almost 10 years, and it "was severe in magnitude." Valdez's symptoms included auditory hallucinations, as well as delusional beliefs or paranoid thought processes. Additionally, Dr. Musacco testified that "a person who is hearing voices or is deeply depressed, the options that they have and the way that they perceive the world is impacted[,] particularly when the disorder is significant in magnitude." He also testified that Valdez's "ability to make a decision, being able to kind of understand … all of the exigencies of life that we have was very different. His world was like this. It was myopic. [¶] So when we talk about him making decisions, it [was] not like he made decisions the same way we make decisions. His decision process [was] much more narrow. So I believe he knew what he was doing. He knew it was wrong. But it is pretty clear that his ability to carry out all aspects of life was extremely impinged upon by his mental illness, and I don't think this particular decision was any different than the rest of his life." The prosecutor did not present any expert evidence to dispute Dr. Musacco's opinions.

Given this evidence, and that diminished actuality was essentially the only issue before the jury, it was particularly problematic that the trial court gave the sanity instruction, which could be interpreted to conflict with the instruction that the jury could consider evidence of Valdez's mental disorder for the limited purpose of determining

13.

whether Valdez harbored malice aforethought. (*Mills*, *supra*, 55 Cal.4th at p. 677 ["the jury was instructed on mental illness and its effect on defendant's actual formation of the intent required for murder. The instruction on the conclusive presumption of sanity could be understood to conflict with that instruction."].)

It is true that, in their closing arguments, both the prosecutor and defense counsel discussed the instruction that the jury could consider evidence of Valdez's mental disorder for the limited purpose of determining whether Valdez acted with the required mental state, and defense counsel relied heavily on evidence of Valdez's mental disorder. However, the jury was instructed that, if there was a conflict between the attorneys' comments on the law and the trial court's instructions, they "must follow [the] instructions." (See *People v. Centeno* (2014) 60 Cal.4th 659, 676 [" 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' "].)

Moreover, rather than clarifying the possible conflict between the instructions, the prosecutor's arguments likely only added to the confusion. The prosecutor specifically addressed the sanity instruction, arguing that "[o]ne of the instructions the judge will read to you and which makes this case somewhat easier for you actually, and that is that [Valdez] is conclusively presumed to be sane. This is not an insanity case, ladies and gentlemen. This is not a question of whether he was sane or insane at the time. He was sane. The question is did he form the intent to do what he did, as he said that he did." However, as sanity was irrelevant, this instruction, which should not have been given, did

not make the case easier for the jury in any way.[10]  And given that the prosecutor erroneously argued that the instruction made the case easier for the jury, the jury could have easily understood this argument as consistent with an incorrect interpretation of the instruction, that is, to weaken (if not outright prevent consideration of) the evidence of Valdez's mental disorder.

As diminished actuality was essentially the only issue before the jury, as there was evidence supporting diminished actuality, and as the sanity instruction was reasonably interpreted through its text and the prosecutor's argument as weakening the strength of this evidence (if not outright preventing it from being considered), we cannot find that the error was harmless.

In resisting this conclusion, the People argue that the jury was instructed that some instructions may not be applicable, and we presume the jury followed the instructions. Thus, according to the People, if the instruction was in fact irrelevant we can presume that the jury disregarded it.  The problem with this argument is that, for the reasons discussed *ante*, the jury could have reasonably concluded that the instruction was applicable and applied it in an impermissible manner.

The People also argue that, "since the prosecutor made it clear to the jury that it was allowed to consider [Valdez's] mental illness defense but it was not to consider sanity, the jury was correctly advised."  However, as noted *ante*, neither the trial court's instructions nor the prosecutor's argument explained to the jury the difference between sanity and mental illness.  As the difference between sanity and mental illness was never explained to the jury, this argument fails as well.[11]

---

[10]  Again, even if the jury "needed" to be informed that the case involved mental illness but not sanity, neither the trial court's instructions nor the prosecutor's argument explained to the jury the difference between sanity and mental illness.

[11]  The People also argue that the evidence "the evidence made it abundantly clear that [Valdez] understood the wrongful nature of his acts and acted intentionally in killing

As the trial court erred in giving the sanity instruction and as that error was not harmless, we will reverse the judgment and remand for further proceedings.

## DISPOSITION

Valdez's conviction is reversed. The People may choose to retry Valdez on this charge. (*People v. Hernandez* (2003) 30 Cal.4th 1, 10 ["the law is clear that, as a general rule, errors other than insufficiency of evidence do not preclude retrial following reversal of conviction"].) The matter is remanded for further proceedings consistent with this opinion.

ELLISON, J.[*]

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.

---

his grandmother." As discussed *ante*, while there was evidence that Valdez acted with malice aforethought, there was also evidence of diminished actuality. And while the People are correct that "the evidence made it abundantly clear that [Valdez] understood the wrongful nature of his acts," the People do not explain how that is relevant to the issue of diminished actuality. As noted *ante*, Valdez did not plead not guilty by reason of insanity.

[*] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.