Filed 12/11/25  P. v. Ingram CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LAKEITH TRENTELL INGRAM,<br><br>Defendant and Appellant. | D084640<br><br><br><br>(Super. Ct. No. SCN445480) |

APPEAL from a judgment of the Superior Court of San Diego County, Saba Sheibani, Judge.  Affirmed.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher Beesley and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

According to Lakeith Trentell Ingram, in July 2023 he agreed to help a friend who was allegedly moving but in actuality burglarized one residence and tried to burglarize another.  The two men were apprehended later the

same day. A jury convicted Ingram of one count of burglary (Pen. Code, § 459; count 1) and one count of attempted burglary (§§ 664, 459; count 2) and found true the allegation as to both counts that the properties were inhabited dwellings (§ 460, subd. (a)). The court sentenced Ingram to two years of formal probation. Ingram raises three issues on appeal.

First, Ingram claims the trial court's mistake of fact instruction as to count 1 was prejudicially erroneous because it required him to disprove two mental states, one of which was inapplicable to burglary. We conclude that regardless of any error, Ingram was not prejudiced because, based on the record evidence, the two beliefs the instruction required the jury to find Ingram possessed were inextricably intertwined.

Second, Ingram contends the trial court prejudicially erred in failing to instruct on mistake of fact as to count 2. We conclude Ingram forfeited this challenge by failing to request the instruction. In the alternative, Ingram claims his trial counsel provided constitutionally ineffective assistance in failing to request such instruction. We disagree. Because instruction on mistake of fact as to count 2 was not supported by substantial evidence, defense counsel's performance did not "f[a]ll below an objective standard of reasonableness . . . [¶] under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.)

Finally, Ingram argues the trial court erroneously delegated its judicial authority in ordering him to complete a program of residential drug treatment and aftercare "if directed by the probation officer." We conclude that because the trial court authorized a residential treatment program, it determined any limitations on Ingram's liberty interests were appropriate, and accordingly the court did not improperly delegate that authority.

We thus affirm.

2

## I.

## A.

According to Ingram, he met his codefendant while playing basketball around January 2023, and they became friends.

In July 2023, Ingram was homeless, without an income, and living at a motel. Ingram's friend asked him to help him move and offered to pay him.

The morning of July 10, Ingram picked his friend up from his father's house. The friend gave Ingram directions to Crest Drive in Carlsbad, where Ingram parked his car. Ingram's friend told Ingram he "would be right back," and Ingram saw him walk down the street and turn onto Buena Vista Way. Ingram may have gotten out of the car to stretch and have a cigarette but otherwise sat in his car, watching videos on his phone, for about 20 minutes until his friend returned emptyhanded. Ingram denied going to Buena Vista Way himself or knowing why his friend asked to stop there.

Ingram's friend got back into the car and gave Ingram directions to the house he claimed to be moving out of, which was located "like, .1, .2 miles away" on Sausalito Drive. Ingram parked, his friend entered the house through the front door, and Ingram sat and waited.

After 10 to 15 minutes, Ingram saw "a lady walking her dog" who stopped and looked at him. Ingram approached her to ask if everything was okay, but she just looked at Ingram "awkward[ly]." The woman "just kind of walked off."

Ingram entered the house to tell his friend about the neighbor and ask if he was ready to go, and the friend told him to grab a bag by the staircase. Because "[t]here was stuff thrown everywhere," Ingram did not want his friend "to think [he] was stealing anything in the house," so he recorded himself carrying the bag downstairs.

After Ingram set the bag by the front door and walked out of the house, he saw a man walking toward him while recording a video on his cell phone. After a brief interaction with the man, Ingram saw his friend exit the house and put "stuff" in the car.

Ingram and his friend got into the car. Ingram's friend told him to "'leave,'" so Ingram drove off and took his friend back to his father's house.

The night before, Ingram took a screenshot of an Internet search for "'how does weight factor in gold price,'" purportedly because his friend had asked him "'how do you calculate gold?'"

## B.

In July 2023, John S. lived on Buena Vista Way. Shortly before 8:00 a.m. on July 10, he was driving back to his house when he saw a man he identified as Ingram standing in front of his driveway. When Ingram saw John turning into the driveway, he walked down Buena Vista Way toward Crest Drive.

John entered his house and went to the kitchen, where he saw a man—later identified as Ingram's codefendant—"trying to jam the door open" from the outside. John went over to where the man was behind the glass and asked, "'What are you doing?'"

After a brief dialogue, John grabbed his cell phone off the kitchen island and called the police. John's doorbell camera recorded Ingram's codefendant walking away.

Several hours later, law enforcement took John to a location to identify two suspects. He identified the first man, Ingram's codefendant, as the one who tried to break into his house. He identified the second man, Ingram, as the man standing in front of his house "kind of looking out if someone came home."

4

## C.

At the relevant time, Cheryl S. and her husband, William C., lived on Sausalito Avenue.

At about 9:00 a.m. on July 10, Cheryl was watering the plants in the front yard when she saw a car "pulled up into the lawn of" the house next door. She identified Ingram as the man standing next to the car.

Cheryl "dropped [her] hose and ran over there and asked him what he was doing." Ingram yelled to someone inside the house, who came out. Cheryl asked the man who exited the house "what he was doing" and told him "he wasn't supposed to be there." She then yelled to William, who was working in the backyard, "to get his phone" while she retrieved hers from inside the house.

Cheryl called the police and told her husband to take photographs of the car. When William came into the front yard, he saw a man he identified as Ingram standing by the driver's door of the car and another man standing on the other side of the car. William began taking photographs of the car and men.

Both Cheryl and William saw Ingram enter the driver's side of the car and the other man enter the passenger's side and drive off.

About thirty minutes to an hour later, law enforcement took Cheryl and William to identify two suspects. Both identified the first man as Ingram and the second man, Ingram's codefendant, as the man who exited the house. They noted that other than now being shirtless, both men were wearing the same clothes as at the time of the burglary.

## D.

William's photographs of Ingram's car included the license plate number. A law enforcement officer on patrol received an alert to look out for

5

a red car with that license plate number.  Shortly before 10:00 a.m., the officer saw the car and followed it, calling for backup.  The officer initiated a traffic stop.  The men in the car were shirtless.

After Ingram and his codefendant were detained, law enforcement officers examined the interior of the car.  In the driver's door pocket, officers recovered jewelry and U.S. Marine Corps pins underneath a pack of cigarettes.  At trial, Ingram agreed his codefendant could not "reach over from the passenger's seat and put stuff in the driver's side door," so anything in the pocket was his and put there by him.  But the owner of the home on Sausalito Avenue testified the jewelry and pins belonged to her.

The remainder of the car contained purses, jewelry, collectible dolls, check registers, and other personal items that belonged to the owner of the Sausalito Avenue home.  There also were two hoodies in the car that Ingram and his codefendant had been wearing earlier in the day.  Officers located a pair of binoculars in the front seat area and a backpack containing burglary tools that Ingram claimed not to have seen or known about.

At the house on Sausalito Avenue, responding law enforcement officers located a rear sliding door that "seemed to be forced open."  According to one officer, "the house was ransacked with cabinets left open and a lot of property tossed on the ground."

E.

After the above evidence was presented to the jury, the jury found Ingram guilty of both charged counts and also found true the allegation that the properties were inhabited dwellings.

Before the sentencing hearing, probation recommended a suspended sentence of 365 days in custody subject to two years of formal probation while the People sought a prison sentence of the middle-term of four years for

6

count 1 and one-third the middle term, or eight months, on count 2. Ingram's counsel requested probation. He also requested "a residential treatment program be a condition of [Ingram's] probation" because Ingram "has realized that he needs [drug] treatment."

During the sentencing hearing, Ingram's counsel reiterated Ingram was seeking "a residential [drug] treatment program" as a component of his probation. While Ingram was presumptively ineligible for probation, the court noted this offense was Ingram's first conviction and he was willing to comply with the terms of probation, so the court imposed 365 days in custody with credit, suspended for a period of two years of formal probation.

One of the probation conditions—9.a, under the heading "DRUG CONDITIONS"—ordered Ingram to "[c]omplete a program of residential treatment and aftercare . . . if directed by the probation officer." The court noted during the sentencing hearing it would make it "an if-directed" condition because "Ingram is going to go through a substance use level of care assessment, and then they can determine whether a residential treatment program is appropriate. Maybe an outpatient. I'm unsure. I think it has to be based on the assessment as to what his level of care should be at that time."

## II.

## A.

Ingram argues the court prejudicially mis-instructed the jury on mistake of fact as to count 1 for burglary. We disagree.

## 1.

We review de novo whether a jury instruction correctly states the law, looking at the instructions and trial record as a whole and considering the challenged instruction in that context. (*People v. Posey* (2004) 32 Cal.4th 193,

7

218; *People v. Mills* (2012) 55 Cal.4th 663, 680.) Where reasonably possible, we interpret the instructions to support the judgment. (*People v. Mason* (2013) 218 Cal.App.4th 818, 825.)

"Where an instruction is erroneous, we must determine whether the error was prejudicial." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1160.) The parties agree the reasonable-probability test for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836-837, applies here.

Under *Watson*, an erroneous jury instruction is prejudicial if "it is reasonably probable [the] defendant would have obtained a more favorable result had the instruction not been given." (*People v. Rogers* (2013) 57 Cal.4th 296, 336.) In making that assessment, we consider the instructions as a whole, the closing arguments, and the jury's findings. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831.) We also may consider "whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177, disapproved on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) It is the defendant's burden to demonstrate prejudice. (*People v. Triplett* (2020) 48 Cal.App.5th 655, 663.)

2.

While discussing jury instructions, the court asked whether "nobody was going to request [CALCRIM No.] 3406," the pattern jury instruction for mistake of fact. Defense counsel responded that, "after [Ingram's] testimony this afternoon, then the defense would be requesting" it.

"[B]ased on the testimony," the court stated CALCRIM No. "3406 would only pertain to the completed burglary." Defense counsel responded: "That's

8

the Sausalito Avenue burglary. It will be to the mistake of fact of him being [at that] house."

The court also noted "there's a specific part of [CALCRIM No.] 3406 that you have to insert the facts" and asked defense counsel "exactly what you'd request." Defense counsel said, "'If you find the defendant believed that [his codefendant] lived or resided at . . . Sausalito Avenue in the City of Carlsbad.'"

The prosecutor disagreed, saying Ingram "has to be mistaken not only that [his codefendant] lived there but that property that was being taken out of the house, all the property, was [his codefendant]'s." After some back and forth, defense counsel said the prosecutor's proposal was "fine."

The mistake of fact instruction read to the jury stated: "[Ingram] is not guilty of count 1, burglary, if he did not have the intent or mental state required to commit the crime because he did not know a fact or mistakenly believed a fact. If [Ingram]'s conduct would have been lawful under the facts as he believed them to be, he did not commit burglary as charged in count 1. [¶] If you find that [Ingram] believed that [Ingram's codefendant] resided at . . . Sausalito Avenue in the City of Carlsbad and the property removed from [the house on] Sausalito Avenue belonged to [Ingram's codefendant], [Ingram] did not have the specific intent or mental state required for burglary as charged in count 1. [¶] If you have reasonable doubt about whether [Ingram] had the specific intent or mental state required for count 1, burglary, you must find him not guilty of that crime."

3.

Assuming, without deciding, for purposes of this opinion that the trial court's mistake of fact instruction erroneously required Ingram "to disprove

9

two mental states before allowing the jury to accept his mistake of fact defense," we conclude the error was harmless under *Watson*.

Although the People argue Ingram forfeited this claim by not objecting at trial, "[t]he rule of forfeiture does not apply . . . if the instruction was an incorrect statement of the law." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) And absent forfeiture, we need not reach Ingram's alternative ineffective assistance of counsel claim. (*People v. Perez* (2010) 182 Cal.App.4th 231, 245, fn. 5.)

Ingram claims *People v. Hendrix* (2022) 13 Cal.5th 933, in which the Supreme Court concluded the trial court gave a prejudicially erroneous instruction on mistake of fact, requires us to reverse. The defendant in *Hendrix* approached a house, rang the doorbell and knocked, went around the house, opened a screen door, tried to jimmy the sliding door behind it, and then sat on a bench until police arrived shortly after. (*Id.* at p. 936.) The defendant had no burglary tools with him. (*Ibid.*) The defendant claimed he believed his cousin, who in fact lived several blocks away, lived in the house and that he meant to visit him. (*Id.* at p. 937.) The People presented evidence that cast doubt on the defendant's claim. (*Ibid.*) The trial court instructed the jury with the version of the mistake of fact instruction applicable to general intent crimes, which requires the mistaken belief to be reasonable. (*Id.* at p. 938.)

The Supreme Court concluded not only was this error, but the error was prejudicial, even under *Watson*. (*Hendrix*, 13 Cal.5th at pp. 939, 944.) "The potential effect of the error was considerable" given the defendant's "mistake of fact claim was the central disputed issue at trial." (*Id.* at p. 945.) Further, the instruction was "highly likely to mislead the jury" because "[a]t least one juror could easily have considered [the defendant]'s purported belief

unreasonable . . . and applied the erroneous reasonableness requirement to rule out" the defense. (*Id.* at p. 946.) That the jury (1) reported a deadlock partway through deliberations and (2) requested a readback of evidence bearing on the defendant's belief were consistent with that conclusion. (*Id.* at p. 947.) The Supreme Court noted "there are reasons for serious doubt [as to whether the error affected the result] in this case, including evidence of conduct difficult to explain as part of an intended burglary"—namely, why the defendant lacked burglary tools and why he sat down on a bench rather than run away. (*Id.* at p. 946.) Accordingly, "[b]ecause there [wa]s at least a reasonable probability a jury making that assessment would have given a different answer had it received correct instructions," the Supreme Court concluded reversal was required. (*Id.* at p. 950.)

*Hendrix*, however, is distinguishable. Here, rather than require the jury to make an unnecessary reasonableness finding, the instruction required the jury to find Ingram harbored two beliefs for the defense to apply: Ingram had to believe both that his codefendant lived at the house and that the property being removed from the house belonged to the codefendant. While in *Hendrix* a jury could easily find the defendant's belief unreasonable, on the evidence presented here, there was no basis for the jury to find one of these beliefs true but not the other.

Ingram's defense to count 1 was that he thought he was helping his codefendant move his possessions from the house he was living in—the Sausalito Avenue house—to a new home. Accordingly, the basis for Ingram's belief that the property belonged to his codefendant was that the belongings were in the home his codefendant occupied but was moving away from. No alternative theory was suggested under which Ingram's codefendant owned the property within the home but did not also reside there. Thus, as the

11

People argue, the beliefs that Ingram's codefendant resided at the home on Sausalito Avenue and that Ingram's codefendant owned the property "were inextricably intertwined" such that "the jury would need to believe the former in order to believe the latter."

Further, while Ingram contends otherwise, the evidence supporting the judgment was strong while the evidence supporting mistake of fact—solely comprised of Ingram's testimony—was comparatively weak. Shortly before the burglary, Ingram searched for how the weight of gold impacts its price—a fact inconsistent with his claim that he was merely helping a friend move. During the burglary, instead of backing into the driveway as a person generally would when loading a car, Ingram parked on the lawn. The house was ransacked. Although Ingram testified that he saw his codefendant enter the house through the front door, law enforcement found a rear sliding door that had been forced open—the same mode of entry attempted by Ingram's codefendant at another house just an hour or so before. Two neighbors, Cheryl and William, witnessed the tail-end of the burglary. Cheryl testified that when she asked what Ingram was doing, he yelled to someone inside the home—a fact consistent with him acting as a lookout. Once confronted, rather than explain their actions, Ingram and his codefendant drove off and removed the hoodies they had been wearing at the time of the burglary. The goods within the car—jewelry, collectible dolls, purses, and more—were less likely to belong to his male codefendant. The codefendant brought binoculars and burglary tools with him in the car. Ingram confirmed that he was the one to place any items in the driver's door pocket, which the owner of the home on Sausalito Avenue testified belonged to her.

The prosecution did not compound this alleged error in the instruction by invoking it during closing arguments; in fact, the prosecution did not

mention mistake of fact at all. Moreover, the jury implicitly found other witnesses more credible in adjudging Ingram guilty.

Ingram makes much of the fact he recorded a video of himself carrying a bag down the stairs of the Sausalito home, claiming that "[d]ocumenting your criminal conduct is . . . very 'difficult to explain' to support the crime of burglary." But as the prosecutor argued in closing, Ingram could have filmed the video as a memento. We thus are unpersuaded the video is significant.

In sum, it is not reasonably probable the outcome would have been more favorable to Ingram absent the alleged mis-instruction.

## B.

Ingram claims the court prejudicially erred in failing to instruct on mistake of fact as to count 2 for attempted burglary. We conclude that claim of error is forfeited and Ingram's alternative claim that he received ineffective assistance of counsel due to defense counsel's failure to request this instruction falls flat because such instruction was not warranted on this record.

## 1.

The People contend Ingram did not request instruction on mistake of fact as to the attempted burglary and accordingly forfeited this claim. We agree.

Mistake of fact is a defense the court must instruct on if (1) *requested* and (2) the defendant "presents substantial evidence on mistake of fact and the instruction is legally correct." (*People v. Speck* (2022) 74 Cal.App.5th 784, 791.) While defense counsel requested instruction on mistake of fact, he agreed with the trial court that instruction was warranted only as to the completed burglary of count 1 and did not ask for that instruction to be given

13

as to the attempted burglary of count 2 as well.  Ingram accordingly forfeited this claim.  (See *People v. Chism* (2014) 58 Cal.4th 1266, 1308.)

2.

We thus proceed to Ingram's alternative claim that his counsel was constitutionally deficient in failing to request such instruction.  We conclude Ingram did not receive ineffective assistance of counsel because instruction on this point was not warranted by the record.

To establish ineffective assistance of counsel, a defendant must show both that (1) "counsel's representation fell below an objective standard of reasonableness . . . [¶] under prevailing professional norms" and (2) "there is a reasonable probability"—one that "undermine[s] confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, 466 U.S. at pp. 688, 694.)  Given the strong presumption counsel acted reasonably, "[o]n direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"In deciding whether defendant was entitled to the instructions urged, we take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief.'"  (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.)  ""'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.'""  (*Ibid.*)  Nonetheless, "the test is not whether *any* evidence is presented, no matter how weak.  Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people]

14

could have concluded'" that the specific facts supporting the instruction existed." (*Ibid.*) In *Speck*, for example, the defendant's testimony negated intent and knowledge requirements of offenses such that he was entitled to instruction on mistake of fact. (*Speck*, 74 Cal.App.5th at pp. 791-792.)

Here, instruction on mistake of fact was unwarranted because substantial evidence did not support the defense. (See *People v. Williams* (1997) 16 Cal.4th 153, 225-226 [no ineffective assistance of counsel in failing to request cautionary accomplice instructions where such instructions "were not . . . compelled by the evidence"]; *People v. Moringlane* (1982) 127 Cal.App.3d 811, 821 [no ineffective assistance of counsel in failing to request instruction where "evidence . . . would have provided no viable diminished capacity defense"].)

Ingram claims the mistake of fact under which he was operating as to count 2 was that "he was helping his friend move." Ingram testified, however they "hadn't reached that destination yet where [he] was supposed to help hi[s codefendant] move," so he could not have been operating under that mistaken belief as to their first stop. He also testified he "didn't know what [his codefendant]—[he] d[id]n't know where [he] was going." This testimony does not support an instruction on mistake of fact because Ingram did not testify to any affirmative fact he misapprehended with regard to the attempted burglary or his codefendant's intentions during the first stop. Recognizing this, defense counsel could have made the entirely reasonable tactical decision not to request instruction on mistake of fact as to count 2 because the court was unlikely to give an unsupported instruction.

Because we conclude counsel's representation was not objectively deficient, we need not address prejudice. (*Strickland*, 466 U.S. at p. 700.)

15

C.

Finally, Ingram claims the trial court violated the California Constitution's separation of powers doctrine by delegating its judicial authority to the probation department because "[t]he 'if-directed' condition gave probation unfettered discretion to select any type of 'counseling, rehabilitation/treatment program.'"

Courts have broad discretion in deciding whether and under what terms to impose probation. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120-1121.) While we generally review probation conditions for abuse of discretion (*id.* at p. 1121), where, as here, the challenge presents a question of law, our review is de novo (*People v. Smith* (2022) 79 Cal.App.5th 897, 902).

The People claim Ingram not only forfeited this challenge by failing to object to the condition but also invited any error by requesting the condition be imposed. As Ingram's claim is a facial challenge to the condition's constitutionality, we conclude forfeiture is inapplicable. (*In re Sheena K.* (2007) 40 Cal.4th 875, 885.) We thus need not reach Ingram's alternative ineffective assistance of counsel claim. (See *Perez*, 182 Cal.App.4th at p. 245, fn. 5.) Further, while Ingram requested residential treatment, the court itself chose, in its words, "to modify 9-A and make that an if-directed." Because Ingram did not request the portion of the condition he now challenges, we conclude he did not invite any error in that regard.

That brings us to the People's second argument: that the court did not impermissibly delegate its authority. We agree.

In arguing otherwise, Ingram relies on *Smith*. There, the defendant, a single mother, was apprehended with drugs, and the probation report disclosed she had long used drugs. (*Smith*, 79 Cal.App.5th at pp. 899-900.) She pled guilty in exchange for two years' probation. (*Id.* at p. 900.) During

16

sentencing, defense counsel informed the trial court the defendant had been unable to find childcare due to the Covid-19 pandemic. (*Ibid.*) The court noted "'there is *some form of treatment that's required* to address . . . substance [abuse] issues.'" (*Id.* at pp. 900-901, italics added.) So the court imposed a condition "requiring Smith to . . . 'participate in any treatment/therapy/counseling program, including residential, as directed by the probation officer.'" (*Id.* at p. 901.)

*Smith* concluded the condition impermissibly "delegates to the probation officer the discretion to decide whether [the defendant] must attend a residential program, as opposed to an outpatient program." (*Id.* at pp. 901-903.) Because "[a] residential program can impose far greater burdens on a person's liberty interests than an outpatient program, . . . a court—not a probation officer—must make the decision to require a defendant to attend residential treatment." (*Id.* at p. 903.) "Although the trial court made clear that Smith needed 'some form of treatment' for substance abuse, the court did not require that she attend a residential treatment program as opposed to an outpatient program. Nor did the probation report specify residential treatment." (*Ibid.*) And of particular importance to *Smith*'s analysis was the fact that "the parties negotiated a disposition that would allow Smith to remain out of custody in part because she had a young daughter for whom she cared at home." (*Ibid.*)

The People, meanwhile, rely on *People v. Penoli* (1996) 46 Cal.App.4th 298, which discerned no improper delegation of judicial authority in a probation condition requiring the defendant "to enter a residential drug treatment program 'as approved by the Probation Officer'" and "'remain there until she has successfully completed'" it. (*Id.* at pp. 301, 310.) *Penoli* noted trial courts are "poorly equipped to micromanage selection of a program" and

17

the condition did not "place the defendant completely at the mercy of the probation department." (*Id.* at p. 308.)

The language of the probation condition at issue here is somewhat different from that involved in either *Smith* or *Penoli*. But while *Smith* acknowledges the defendant asserted a facial challenge, it nonetheless engaged in a fact-specific, "as-applied" analysis of the condition. We accordingly find it less persuasive.

We instead conclude a probation condition requiring the defendant to "[c]omplete a program of residential treatment and aftercare . . . if directed by the probation officer" is constitutional. A court authorizing this condition has determined residential treatment is appropriate for the defendant. In doing so, the court has not left to the probation department the important determination of whether the defendant's liberty interests can be limited. While the probation officer may impose a lesser burden on the defendant's rights—for example, by not requiring treatment at all if the drug assessment concludes treatment is unwarranted—the probation officer is not making the determination that the defendant's liberty interests may be so restricted. The probation condition is thus facially constitutional.

III.

We affirm.

CASTILLO, J.

WE CONCUR:


IRION, Acting P. J.


RUBIN, J.

18